[No. 27481.   Department Two.   August 25, 1939.]

*In the Matter of the Estate of* A. E. LARSON, *Deceased.*

SHIRLEY D. PARKER, *as Administrator, Appellant,* v. R. M. HARDY *et al., Respondents,* NAT U. BROWN *et al., Respondents and Cross-appellants.*[1]

[1]Reported in 93 P. (2d) 431.

*Isham N. Smith, Richards, Conklin & Delle,* and *I. J. Bounds,* for appellant.

*Cheney & Hutcheson,* for respondents Hardy *et al.* and respondents and cross-appellants Brown *et al.*

*Padden & Moriarty,* for respondents Stolle *et al.*

MILLARD, J.—On the ground that the defendants evolved and executed a plan (option and sale of eighty-five thousand shares of Sunshine Mining Company stock) by which they devastated the Larson estate and unjustly enriched themselves, Shirley D. Parker, as administrator *de bonis non* with the will annexed of the estate of A. E. Larson, deceased, brought this action to recover in excess of two million dollars against the former corporate executor (Yakima First National Bank) of the estate and against the executor's officers and employees and against other defendants.

One of the affirmative defenses was that the plaintiff is concluded by the court's orders authorizing option and sale of the shares of stock and the decree approving the executor's final account.

Two defendants, who were allowed as attorneys for the former executor a fee of twenty-five thousand dollars, all of which was paid except twenty-five hundred dollars when decree was entered approving the final account of the executor, by cross-complaint sought award of that balance and of an additional fee in the amount of twenty-five hundred dollars for professional services rendered by them to the estate subsequent to discharge of the executor—a total recovery of five thousand dollars.

The trial court expressed the view that Mrs. Larson, the only person really in interest, may not maintain this action, as the original sale of fifteen thousand shares of Sunshine stock and the option given on seventy thousand shares of that stock were at the behest and with the consent of Mrs. Larson; that, at the time of the entry of the decree approving the executor's final account, Mrs. Larson was then possessed of all the information regarding the administration of the *res* of this estate that she ever obtained subsequently, and that the release of the executor at that time effectually

released it and its attorneys and all other joint *tort-feasors*. The trial court was of the further opinion that the cross-complainants were entitled to a recovery of only the balance due under their contract with the executor. Judgment dismissing the complaint and awarding recovery of twenty-five hundred dollars to the cross-complainants was entered. Plaintiff appealed. Cross-complainants cross-appealed.

In 1920, A. E. Larson, Alexander Miller, J. B. Cox, and N. P. Hull (at his death succeeded on the board of directors of the Sunshine Mining Company by his son, Carroll Hull) became interested in the Sunshine silver mine in Idaho. A. E. Larson, who was president, and Alexander Miller, who was vice-president and treasurer, of the mining company, were also vice-presidents and directors of the Yakima First National Bank, of Yakima, Washington.

In the early part of 1934, Grande, Stolle & Company, of Seattle, agent of Seligman & Co., an investment brokerage firm of New York, endeavored to obtain a listing of the Sunshine Mining Company stock upon the curb exchange for unlisted trading. Later, in the spring of that year, an effort was made by Stolle to obtain general listing, as under the securities exchange act the stock could not be admitted for unlisted trading. In the spring of 1934, the stock was worth about six dollars a share on the Spokane market, which was the only market available for the stock at that time. By the middle of June, the stock had fallen to $5.40 a share. In submitting his financial statement to the bank as a basis for loans, which he subsequently made in 1934, Larson placed the value of his stock at one dollar a share.

Sometime in May, 1934, while Mr. Larson was confined to the hospital, a meeting of the board of directors

of the Sunshine Mining Company, at which meeting Miller, Cox, I. H. Dills, and Hull were present, a resolution was passed directing Mr. Dills to ascertain from Seligman & Co. the details and expense of listing the Sunshine Mining Company's stock upon the curb exchange. During that spring, Mr. Miller was of the opinion that the stock was selling at a price in excess of its value, and he therefore sold off his stock in small quantities as rapidly as it could be absorbed by the Spokane market. All of the directors, with the exception of Larson, desired the stock to be listed on the curb exchange and agreed they would override Larson's objections to listing the stock.

On June 7, 1934, A. E. Larson died. By his will, he made special bequests of approximately five hundred thousand dollars, among which was one of five thousand dollars to R. M. Hardy, president of the Yakima First National Bank, in appreciation of the honesty of the latter in business dealings. The most valuable and highest income-producing property of the Larson marital community was 210,974 shares of stock in the Sunshine Mining Company, a domestic corporation, which owns valuable silver mines in Idaho. Larson nominated the Yakima First National Bank as executor of his estate. Mr. Larson was buried June 11, 1934.

During the interim between the dates of Larson's death and burial, Mr. Miller, who was eighty years of age and succeeded to the presidency on the death of Mr. Larson, endeavored to find some one who could be elected to the board of directors and take over the presidency of the mining company. On June 11, 1934, two days prior to the probate of the will on June 13, 1934, R. M. Hardy consented to act as president of the Sunshine Mining Company. On that date, in order to qualify him, Mr. Miller transferred one thousand shares of the stock of that company to Mr. Hardy.

That evening, the board of directors of the Sunshine Mining Company elected Mr. Hardy to membership on the board. At that meeting, Charles Samuels, the general superintendent of the mine, and Mr. Doucette, the foreman of the mine, were present. They informed the members of the board of directors, who were discussing the question of listing the stock upon the curb exchange, that, in order to obtain a listing of the stock, it would be necessary to have an engineer's report. They further advised that some care would have to be exercised in the selection of the engineer, as a good engineer would not pass the mine for listing. Mr. Miller appointed a committee consisting of the secretary of the company, the attorney for the company, I. H. Dills, and R. M. Hardy to investigate the listing.

On June 13th, the Yakima First National Bank qualified as executor and the will was admitted to probate. On the same date, the residuary legatee and surviving widow filed a petition for family allowance, alleging that the value of the estate was approximately one and one-half million dollars.

On the 27th day of June, 1934, the board of directors of the Sunshine Mining Company adopted a resolution authorizing the filing of an application for listing of the stock. Seligman & Co. agreed to undertake the listing and pay all expenses upon condition that the four major stockholders—the Larson estate, Alexander Miller, Mrs. N. P. Hull, and J. B. Cox—would agree to sell ten thousand shares each, grant options upon sufficient of the remainder of their shares of the stock to represent approximately a total of forty per cent of their holdings, and agree that they would not sell more than a limited quantity of stock; and that Stolle Company, who represented Seligman & Co., should obtain a minimum of two hundred thousand shares

under a contract and option. The executor bank retained the firm of Rigg, Brown & Halverson as its attorneys.

During the period of the first negotiation, Mrs. Larson and her son, Shirley D. Parker, were absent in California. When they returned to this state, about July 4, 1934, R. M. Hardy explained all of the transaction respecting the agreement for listing of the stock to Shirley Parker, who was acting as the agent of his mother. At her request, Shirley Parker was placed on the pay roll of the bank as executor, at a salary of one thousand dollars monthly, to assist in the administration of the estate. Shirley Parker, Mrs. Larson's son by a prior marriage, was a practicing lawyer, and some of his years as an attorney-at-law were with one of his present counsel, I. N. Smith.

Upon the return of Mrs. Larson and her son to this state, the latter consulted with a reputable lawyer of Yakima respecting the exercise by Mrs. Larson of her right to administer the community estate. He later informed that lawyer he would permit the bank to continue if satisfactory fee arrangements could be made with the executor's attorneys. At a conference between Parker and the attorneys of the executor bank, the listing of the stock was discussed, and the parties agreed upon an attorney's fee of twenty-five thousand dollars. Parker insisted that the estate be closed within one year, as he desired to avoid long drawn out proceedings with resultant expense. The attorneys advised Parker that, if the listing arrangements were consummated, the options taken and the stock sold at the option price, the estate could be closed within a year except for the final clearance from the state and Federal governments, which would probably require a little more time.

It clearly appears from the evidence that Hardy in-

formed Parker respecting the options, the requirement of a favorable engineer's report, and that Seligman would exercise the options if the report was favorable. It is also clear that Parker was given all the information that Mr. Stolle gave to Mr. Hardy and the other directors.

On July 26, 1934, the attorneys for the executor bank prepared a petition, which was presented to the court commissioner, for authority to sell ten thousand shares of stock upon installment paying basis at $5.825 a share, and to option seventy thousand shares of the stock at $6.90 a share. Mr. Parker read the option form and discussed at some length the matter with the attorneys. Mr. Parker testified that Mr. Hardy told him that he believed that, if the listing program succeeded, the market under the guidance of Seligman would increase the price of the remainder of the Sunshine stock in the Larson estate in an amount in excess of the worth of all of the stock at that time. Mr. Parker testified that he read the petition requesting the authorization and he believed that it would result in benefit to the estate. Others testified in favor of granting the petition, and no one appeared in opposition to it.

The petition states that it is necessary that some part of the personal property of the estate be sold to pay the specific bequests provided in the will and that the petitioner believes that the offer of Grande, Stolle & Company is the best offer that could be received for a portion of the stock. The superior court commissioner of Yakima county signed the order authorizing the sale and delivered the original petition and the signed order to the attorneys for the executor. The petition and order were not filed until February 27, 1935, which was subsequent to the date of the exercise of the options for seventy thousand shares of stock.

On July 31, 1934, on request of Mr. Parker, a second petition was presented to the court commissioner for authority to sell fifteen thousand shares of the Sunshine stock at $5.825 a share for cash. An order was made authorizing the sale of fifteen thousand shares at $5.825 a share. After this order, which canceled the order of July 26, 1934, as to the sale of ten thousand shares and ratified the order authorizing the optioning of seventy thousand shares, was signed by the court commissioner, it, together with the petition therefor, were given to the attorneys for the executor bank and by them placed in their safe. On August 13, 1934, the stock was listed on the curb exchange of New York.

Parker possessed this information. He continuously watched the trust ledger kept by the bank executor, and he saw the sales of the stock being made at $6.90 a share when the market price was increasing to ten, eleven, and twelve dollars a share.

About August 15, 1934, an attempt by diamond drilling to intersect the vein in the mine on the twenty-three hundred foot level was successful, and good ore was found. That vein was seven and one-half feet wide, and the company's assay disclosed forty ounces of silver to the ton. A statement was sent to the stockholders of the Sunshine Mining Company, in which the listing of the stock on the curb exchange was announced and a statement was made of the result of the diamond drilling. A copy of this report was also released to the press. In the latter part of August or the first week of September, 1934, a copy was personally delivered to Mr. Parker and to Mr. Hardy.

About this time, at the instance of Mr. Parker, it was decided to request an extension of time to November 23, 1934, in which to file an inventory and appraisal of the estate. On October 25, 1934, an order, which recites appearance of the executor by its at-

torneys and that Rose B. Larson appeared by her duly authorized agent, Shirley D. Parker, was entered by the court authorizing the extension.

The first mining stock of the Larson estate under option was sold about September 1, 1934. About December 5, 1934, is the last date of the exercise of the option to purchase the stock. In August, 1934, Parker, who was acquainted with the market price of that mining stock on the Spokane market and the New York curb exchange, went to Los Angeles and then to New York. On August 23, 1934, he telegraphed Mr. Hardy expression of appreciation for the letter and enclosures received from Mr. Hardy, and asked Hardy for the status of the options and for further developments or news. Hardy telegraphed Parker that no further options had been taken up, and that the drilling disclosed good ore in the mine on the twenty-three hundred foot level.

The next day, Parker departed for New York and so advised Hardy. While in New York, he visited Mr. Seligman, who gave to him a copy of the printed application to list the Sunshine stock. Parker was informed by Seligman, in answer to his request for the opinion of the latter as to the height the price of the stock would rise, that the price would go as high as fifteen dollars a share at the then price of silver. There is testimony to the effect that Parker informed Seligman that the Larson estate owned about two hundred thousand shares of this mining stock, on a portion of which options had been given and some of the shares sold, and Seligman's advice was sought respecting the question whether more stock should be sold.

There is no doubt that, either in August or in November, 1934, Parker received full and complete information concerning the mine and the value of the stock. While he was assisting in administration of the

estate, he inspected the trust ledger, which was in custody of the corporate executor, and saw the entries therein covering deposits, disbursements, etc., during 1934 and 1935. In that ledger is a copy of the petition for probate of the last will of A. E. Larson, with which is the inventory and appraisement of the estate. The mining stock was appraised at $6.90 a share, with the exception of fifteen thousand shares, which were sold at $5.825 a share, all information as to which is entered in the trust ledger, which Parker testified he read. The record was before Parker and shows that the corporate executor received the money upon the exercise of the options between September 1, 1934, and December 5, 1934, and that record, which Parker read, shows the deposits of the trust funds and the date of each deposit.

After December 5, 1934, Mr. Parker and his mother were absent from this state. As his mother's agent, he wrote to a firm of reputable attorneys in Yakima, which he retained to advise him as to the statutory requirements for publication, in order that the estate might be closed at the earliest possible moment after February, 1935. This firm of attorneys examined the court records on file and checked the inheritance tax reports, etc. Parker knew that, while the Sunshine stock of the estate was appraised at $5.825 and $6.90 a share, that stock was then selling for twice that amount.

On November 10, 1934, a complete report on diamond drilling in the mine was mailed to all of the stockholders of the mining company, released to the press, and a copy given to Mr. Parker at that time. This, doubtless, was the report for which Parker was waiting when he appeared in court October 5, 1934, as the duly authorized agent of his mother, Mrs. Rose B. Larson, and testified in support of his petition for an

extension of time to November 23, 1934, in which to file an inventory and appraisal of the estate. On February 2, 1935, and on February 13, 1935, Mr. Parker became conversant with the engineer's report of developments since the report of July, 1934, of that engineer.

On or about this time, Mr. Parker requested that the estate be closed. The attorneys for the executor commenced preparation of the final account. On discovering that the petitions and orders for the sale and option of the stock had not been filed of record, those attorneys immediately had them filed. On April 23, 1935, the bank, as executor, filed its final report and petition praying distribution of the estate and discharge of the executor. The petition was set for hearing on May 24, 1935. Mr. Parker, acting for his mother, retained a firm of attorneys to represent the beneficiaries upon the hearing of the final account. Parker and Mr. I. N. Smith (one of the attorneys for the appellant) had a copy of the final account. The attorneys retained by Mr. Parker obtained three continuances, the last continuance setting the hearing on the final account on June 25, 1935, for Mr. Parker's convenience and because of the illness of Mr. Smith.

On May 1, 1935, the court entered an order granting the petition for preliminary partial distribution to Mrs. Larson of fifteen thousand shares of Sunshine stock. That petition recited that the inventory showed a total of 210,974 shares of Sunshine stock as property of the Larson marital community, of which stock eighty-five thousand shares had been sold, leaving 125,974 shares in the estate.

In May or June, 1935, it was decided that, instead of finally closing the estate, the bank would resign as executor and Shirley D. Parker would be appointed administrator *de bonis non* with the will annexed, and

all the estate would be distributed to Mrs. Larson except enough to pay the unpaid bequests, in the amount of approximately ninety-five thousand dollars, and any future or additional inheritance taxes that might be due. Prior to the consummation of that plan, one of the attorneys retained by Parker, one of present counsel for appellant, Shirley D. Parker, and one of the attorneys for the executor bank had a conference respecting the execution by Mrs. Larson of a bond to save the bank harmless from any unpaid obligations and giving a general release to the bank. Parker inquired whether the release would discharge the bank from undiscovered fraud. He was assured that it would not; that the release was not intended to cover undiscovered fraud.

There is testimony that one of the reasons the bank desired the release was that the record showed sales of Sunshine stock at $6.90 a share, when that was less than the market price of the stock, with which situation all the parties were familiar, and the bank wanted the release from any possible liability on any such transaction. Mr. Parker's testimony was to the effect that he was informed that, if a release were not signed, the bank would demand fifty thousand dollars executor's fees and one hundred thousand dollars as attorney's fees.

Prior to the hearing upon the final account, one of the attorneys retained by Mr. Parker made a thorough examination of the records at the court house and, of course, informed himself respecting the petitions and orders authorizing sale and option of the stock. In his discussion with Mr. Parker and one of present counsel for appellant of the question of the validity of those transactions, one of Mr. Parker's attorneys advised them that any objections they had to the sales and options should be made at the hearing upon the final

account. At that time, Parker and one of his present counsel were complaining of fraud by the bank and its president in the matter of the sale of the stock at less than the market price.

On June 25, 1935, the resignation of the bank as the executor of the estate was accepted and an order was entered approving the account of the executor, fixing executor's fees and attorney's fees, partially distributing the estate, and appointing Shirley D. Parker as administrator *de bonis non* with the will annexed. The petition of his attorney for appointment of appellant as administrator *de bonis non* with the will annexed recites:

"That Yakima First National Bank, a corporation, named as executor in said will, duly qualified as such and from the time of its appointment and qualification has duly administered said estate. That said executor has filed in this court an account of all its acts in relation to the administration of said estate and has tendered its resignation as such executor to this court, asking that its account be approved and that all of said estate be distributed except 15,000 shares of stock of Sunshine Mining Company, a corporation. Said executor has further asked that it be discharged from further responsibility under said trust and that its sureties be discharged from further liability on its bond."

The order approving the final account and making the appointment requested recites that there has been no final audit as to inheritance tax, that there may be further liability, that there were unpaid bequests approximating ninety-five thousand dollars, and recites:

"That by reason of the non-payment of said two bequests and the possible liability of said estate for further inheritance taxes and estate taxes, it is not deemed advisable to close said estate at this time, but that the court deems it advisable that a partial distribution of said estate be had and that the court finds that 15,000 shares of the capital stock of the Sunshine

Mining Company, a corporation, will be fully sufficient and ample, if sold, to pay said bequests and any further claims against said estate for inheritance taxes or estate taxes, and additional costs of administration, if any."

The order also recites that all the property of the estate was inventoried and appraised, that Rose B. Larson, widow of the deceased, is the only heir, and then proceeds to distribute the property as follows:

An undivided one-half interest in certain real property subject to a life estate to Rose B. Larson, and then adjudges,

". . . that all the remainder of said estate, real, personal and mixed, wherever situate and being, or to which the said deceased was at his death in any way entitled, and all equitable and legal rights which he held or may hereafter acquire, whether described in the inventory and appraisement herein or any of these proceedings or not, except 15,000 shares of the capital stock of the Sunshine Mining Company, a corporation, be and the same is hereby distributed to Rose B. Larson, widow of said deceased, of legal age; . . ."

The fees of the bank were fixed at fifteen thousand dollars and the fees of the bank's attorneys were fixed at twenty-five thousand dollars, of which amount twenty-two thousand, five hundred dollars had been paid, and it was further adjudged and decreed:

"ORDERED, ADJUDGED AND DECREED that the said account and supplemental account of Yakima First National Bank as executor to the date hereof be and the same is hereby fully approved and confirmed, and all payments made by said bank are hereby ratified and approved; and

"IT FURTHER APPEARING TO THE COURT that at the conclusion of said hearing on said account, said Yakima First National Bank submitted its resignation as executor herein, and the said Rose B. Larson submitted a verified petition asking for the appointment of

Shirley D. Parker, her son, as administrator de bonis non with the will annexed."

The resignation of the bank was accepted, Parker was found to be a proper person for appointment as administrator *de bonis non* upon his qualifying therefor, and in conclusion it was

"ORDERED, ADJUDGED AND DECREED that on the filing by said Yakima First National Bank of a receipt from the said Rose B. Larson showing delivery to her of all the personal property now in the hands of said bank belonging to said estate, with the exception of 15,000 shares of the capital stock of Sunshine Mining Company, a corporation, and a receipt showing delivery to the said Shirley D. Parker, as administrator de bonis non with the will annexed, of the said 15,000 shares of the capital stock of the Sunshine Mining Company, said bank shall be entitled to an order exonerating its bond as executor herein and exonerating it from any further liability of any kind, character or description as executor of said estate."

Thereafter, a distribution of the Larson estate was made as directed in the order of June 25, 1935. On July 6, 1935, the court entered its final order accepting the resignation of the executor and discharging it and its bondsmen from liability.

The bond and release signed by Rose B. Larson was signed in the presence of only her son, who took that instrument to her. He testified that he had a general conversation with her when she signed the release to the effect that she was releasing the bank for all books of account, and she read the release before she signed it. The bond and release signed by Mrs. Larson when same was presented to her for that purpose by her son, at which time none of the rest was present, reads, so far as material, as follows:

"Whereas, It is the desire of both parties hereto to distribute all the property thereof in the hands of said bank, except 15,000 shares of the capital stock of Sun-

shine Mining Company, to the undersigned, and to permit the bank to resign its trust;

"WHEREAS, no final audit of the Federal estate tax return and the state inheritance tax return has been made and there may be a liability of said estate for additional estate and inheritance taxes;

"Now THEREFORE, if the above bounden principal shall pay all additional Federal estate taxes and state inheritance taxes and all other claims of like kind, character and description that may be made against the said bank as executor, this obligation shall be void; otherwise to remain in full force and effect. And the above bounden principal further hereby released the said bank and its officers, and agents from all claim of any kind, character or description that may now exist or may hereafter arise by reason of said bank's acting as executor of said estate or in the conduct of the business of said estate during such time as said bank was executor. Provided that this release shall not operate to release the said bank and its officers from accounting for the property and assets of said estate and distributing the same in the manner provided by law, nor relieve the attorneys for said executor and said estate from their duty of handling all matters in connection with inheritance taxes and estate taxes, or any litigation that may arise therefrom, without further expense to said estate, other than the balance due on the fee allowed by court, for their services."

The ten days in which to commence proceedings for revision of the accounts of the court commissioner expired July 5, 1935. The final order discharging the executor and exonerating the bond was filed July 6, 1935, after all the receipts and other orders had been filed showing the delivery of all the personal property in the hands of the bank, with the exception of fifteen thousand shares of the mining stock, to Rose B. Larson, and showing delivery to Shirley D. Parker, as administrator *de bonis non* of fifteen thousand shares of Sunshine Mining Company stock.

This action was commenced by the filing of sum-

mons and complaint June 23, 1936. Notice of appeal from the judgment effective November 22, 1938, was filed December 10, 1938, and the cause heard in this court June 12, 1939. In addition to briefs and citations covering six hundred and ninety-six pages, the record consists of four hundred pages of transcript, twenty-one hundred and forty pages of testimony, and many exhibits; however, our disposition of the appeal obviates necessity of discussion of all of the questions presented by appellant's twenty-two assignments of error.

■ The orders of July 26 and July 31, 1934, authorizing option and sale of the Sunshine Stock, were entered by the probate court pursuant to statutory authority (Rem. Rev. Stat., §§ 1493 to 1591), therefore were valid. The statute (Rem. Rev. Stat., § 1493 [P. C. § 9975]) provides that the court may order a sale of any personal property of the estate for any reason which may, to the court, seem right and proper, upon such terms or conditions as the court may prescribe. The grant of an option to buy is within the terms of a power to sell, where reasonably necessary to effect a sale at an advantage. 3 Bogert on Trusts and Trustees, 2186, § 741.

■ The orders authorizing the option and sale of the stock and the receipt and disbursement of the proceeds of the sale of the stock were ratified and approved by the decree of June 25, 1935, which approved the final account of the executor and made complete and final distribution of the estate, with the exception of certain property which was reserved for use in payment of certain bequests and unpaid taxes. Hearing was had upon proper statutory notice. All parties interested appeared in court by counsel and obtained three continuances. They carefully examined the account, discussed the subject of sales of the stock and the price received for the stock. A full and complete

hearing was had in court, where all were given opportunity to voice any objection any desired to make. Mr. Parker was advised by his counsel that the hearing on the final account was the time and the place to complain, but he registered no complaint. There was no appeal from the decree of final distribution, therefore, the decree is *res adjudicata*. *Laack v. Hawkins*, 155 Wash. 308, 284 Pac. 89.

"The order in probate upon the statutory published notice approving the executor's final account and the decree of distribution is final and *res adjudicata* of all matters covered by that order and all questions that should have been raised at the hearing upon the final account and petition for distribution. . . .

"The entire history of the mortgage transactions which constituted a refund of a prior mortgage debt created by Bostock in his lifetime appears in the interim report of November 4, 1931, a copy of which was sent to appellants' attorneys. While the mortgages were not originally authorized by the court, the mortgages were ratified by its order approving the interim report." *Bostock v. Brown*, 198 Wash. 288, 88 P. (2d) 445.

In reversing a judgment of the superior court setting aside a court commissioner's order in a probate matter, which order was not taken before the superior court for revision nor was an appeal taken therefrom, we said in *In re Rabie's Estate*, 199 Wash. 207, 90 P. (2d) 1011:

"The order of March 31st, eliminating the eight thousand dollars from the inventory, being neither taken before the superior court for revision nor appealed from, became a final adjudication, and it is not before us for review. We express no opinion as to whether the commissioner was in error when he entered the order of March 31st which struck the eight thousand dollars from the inventory.

"Whether the court commissioner had the right to vacate the order bringing the entire eight thousand

dollars into the inventory with the consent and· approval of all the interested parties, is not of controlling importance. It may be said, in passing, that, the order having been consented to and approved, those now objecting to it are not in a position to complain. [Citing cases.] The reason is that the parties, in effect, having invited the court commissioner to enter the order, will not be permitted to complain thereof, even though its entry was erroneous. [Citing cases.]"

Our examination of the record discloses that none of the respondents purchased or received, directly or indirectly, any shares of Sunshine stock of the Larson estate. The record is clear that, so far as any information which would throw light on the orders of July 26 and July 31, 1934, is concerned, nothing was concealed from Mr. Parker, who was the agent and attorney for his mother. If we assumed that the only testimony in the record was that which sustained the allegations in the complaint as to the two orders and the final decree, a case would be presented of intrinsic fraud; hence, insufficient to sustain a cause of action. *Bostock v. Brown,* 198 Wash. 288, 88 P. (2d) 445.

Mrs. Larson, acting with full knowledge of the facts of the case, not under the influence of misrepresentation or other wrongful conduct on the part of respondents, and represented by her son, an attorney, executed the release quoted above. She is now estopped by that release to allege that the conduct of the executor was a breach of trust. 4 Bogert, Trusts and Trustees, 2708, § 941.

At the time the release was executed, Mrs. Larson was represented by four lawyers, one of whom was her son, Shirley D. Parker. All of those lawyers were fully advised as to all of the facts. The subject of prosecution of the action which is now before us, was discussed by those lawyers; and at that time, Mr. Parker was advised that the questions he now raises,

if not raised prior to execution of the release and the entry of the decree approving the final account, would be barred by the release and the decree.

None of the respondents conversed with Mrs. Larson respecting the release. Her son, appellant administrator, took the release to his mother, whom he advised that she was releasing the bank. Mrs. Larson read the release and signed it. There is no evidence that she did anything under duress, and there is not, as there surely cannot be, any claim that Mr. Parker did anything under duress. Our research fails to elicit any evidence that Mrs. Larson, who never testified, did not know everything that it is claimed was concealed from Shirley Parker. There is a complete failure of proof of an essential element to establish the charge of fraud; that is, that the facts were concealed from Mrs. Larson.

The assignment that the court erred in not construing clause seventeen of the Larson will as prohibiting the grant of the options, and that the orders of July 26 and July 31, 1934, were violative of that clause, is without substantial merit. The clause provides that the executor shall have three years, if necessary, to liquidate enough property to pay all of the bequests of the testator. All that is meant by the clause is that the executor is given in excess of the statutory six-months period and prevents a legatee from successfully claiming interest because of failure of payment of a legacy prior to three years.

Any claim that the orders were erroneous because of clause seventeen of the will may not be urged at this time. The question of the propriety, necessity, or reason for the sale of the stock was completely adjudicated by the entry of the order and became final upon the expiration of the time to appeal or revise, as we stated in an earlier portion of this opinion.

Counsel for appellant assign as error the award to Brown and Halverson, attorneys for the executor, of twenty-five hundred dollars, balance of attorney's fee reserved by decree entered June 25, 1935. Those two attorneys cross-appealed from the judgment which limits their recovery to twenty-five hundred dollars.

A few days prior to the resignation of the bank as executor of the Larson estate, Mr. Brown, one of the executor's counsel, discussed with appellant Parker and Mr. Smith, one of appellant's attorneys, the question of the validity of Mr. Larson's bequest of forty thousand dollars for the improvement of Painted Rocks Park in Yakima county. The resignation of the executor, the execution of bond and release by Mrs. Larson, the petition and appointment of appellant as administrator, and the final hearing, were all parts or steps of one transaction or proceeding in which all of the parties appeared. With knowledge of the provisions of the will and acquaintance with the question as to the validity of the Painted Rocks Park bequest— one of the bequests to secure payment of which fifteen thousand shares of Sunshine stock were transferred to appellant administrator — a decree was entered awarding the attorneys of executor bank a fee of twenty-five thousand dollars, all of which, with the exception of twenty-five hundred dollars, was paid by the estate to the attorneys. That the fee of twenty-five thousand dollars was allowed for all services of the attorneys to the estate to the date of decree of June 25, 1935, and for services to be rendered in the future in connection with inheritance taxes solely, is clear from an inspection of the bond and release executed by Mrs. Larson. So far as pertinent, that instrument reads as follows:

"Provided that the release shall not operate to  .  .  . relieve the attorneys for said executor of said estate

from their duties in handling all matters in connection with inheritance taxes and estate taxes or any litigation that may arise therefrom, without further expense to said estate, other than the balance due on the fee allowed by the court, for their services."

All that was required of the executor's attorneys, to be entitled to the twenty-five hundred dollars reserved from their fee of twenty-five thousand dollars, was to handle the inheritance tax question and any litigation arising therefrom; this they did. It follows that those attorneys are entitled to that amount awarded by the judgment in this action.

Cross-appellants insist that they are entitled to an additional fee of not less than twenty-five hundred dollars for services rendered to the estate after the bank resigned as executor. Appellant retained those attorneys a few days subsequent to entry of decree of June 25, 1935, approving final account of executor, appointing present administrator, etc., to institute an action to set aside the Painted Rocks Park bequest. Those two lawyers were successful and thereby increased the residuary estate of the appellant's mother in the amount of forty thousand dollars, less Federal and state inheritance taxes of a little more than two thousand dollars.

Counsel for appellant concede that a reasonable fee should be paid for the "good work" performed, if the estate is liable therefor, but argue that the attorneys knew, prior to the resignation of the executor and the discharge of the executor's attorneys, that the bequest was invalid, and it was part of the duty of those attorneys "then to protect the estate by attempting to void the legacy."

Patently, the attorneys are entitled to compensation for the services they rendered to the estate which retained them to render special legal services which they

efficiently performed. They were retained by appellant, to whose attention the question of the validity of the bequest was brought prior to his appointment as administrator and before the discharge of cross-appellants as attorneys for the executor, and with full knowledge of all the facts those attorneys were relieved from duty of handling any matter in connection with the estate in the future except the matter of taxes. They did not conceal from the appellant, prior to his appointment as administrator, the fact that they questioned the validity of the bequest. Every duty that devolved upon them prior to the final settlement, the resignation of the executor, and their discharge as attorneys of the executor, was performed by cross-appellants. The fee they ask is reasonable for the very considerable service rendered to the estate since June 25, 1935.

The judgment is affirmed on the appeal. The judgment is reversed on the cross-appeal, and remanded with direction to the trial court to enter judgment in favor of cross-appellants for the additional fee of twenty-five hundred dollars, or a total award of five thousand dollars.

BLAKE, C. J., GERAGHTY, ROBINSON, and SIMPSON, JJ., concur.