Argued January 15; affirmed June 16; attorney's fee allowed
July 7, 1942

# HAGEY *v.* MASSACHUSETTS BONDING & INSURANCE CO. ET AL.

(126 P. (2d) 836, 127 P. (2d) 346)

134

Before Kelly, Chief Justice, and Belt, Bailey, Lusk, Rand, Rossman and Brand, Associate Justices.

*John Lichty*, of Portland (Lichty & Doxey, of Portland, on the brief), for appellant.

*MacCormac Snow*, of Portland, for respondents.

ROSSMAN, J. This is an appeal by the Massachusetts Bonding & Insurance Company, one of the two defendants, and a cross-appeal by the four plaintiffs from a decree of the circuit court in favor of the plaintiffs and against both defendants. The appellant was the surety upon the administrator's bond of J. L. Hammersly, who administered upon the estate of Plympton J. Kelly, deceased. Hammersly is the other defendant. The plaintiffs (cross-appellants) are four in number. One is Gertrude Hunter, niece of the deceased; the second is Lloyd Woodside, nephew of the deceased; the third is the administrator of the estate of L. J. Kelly, deceased, who was a brother of Plympton J. Kelly; and the fourth is the administrator of the estate of Lou B. Kelly, deceased, who was another brother of Plympton J. Kelly. Both L. J. Kelly and Lou B. Kelly were living at the time of Plympton J. Kelly's death. The decree under attack set aside an order of the probate department of the circuit court for Multnomah county which was entered October 22, 1935, and which approved the final report of Hammersly. Having done so, it surcharged Hammersly's account with the additional sum of $13,197.16 and entered judgment against both defendants for that amount. To the judgment against the surety it added $1,500 as an attorney's fee. The surety is the only appellant.

The decree set aside the order of the probate court which approved Hammersly's final account upon a finding that prior to its entry Hammersly was guilty of a devastavit. It found that by deceiving the heirs concerning the value of some of the assets of the Plympton J. Kelly estate, and by assisting in the presentation of false claims against the estate, Hammersly

and two attorneys associated with him wrongfully took from the estate $13,197.16.

Plympton J. Kelly died October 18, 1933, leaving an estate worth approximately $100,000. Included among the items constituting the estate was a large amount of municipal and corporate bonds. Eight days after Kelly's death there was admitted to probate as his will a document which he signed October 11, 1933. It bequeathed a substantial part of the estate ($41,-614.62) to one Jessie G. Northrop, who possessed $13,391.59 worth of property which she claimed Kelly had recently given her, but which she later, under threat of suit, returned. Since she was residuary, as well as specific, legatee, this property would have been hers if the will was valid, and even though the attempted gift was incomplete. Mrs. Northrop and another were appointed executors. Upon the appearance of the purported will the heirs entered into a written contract with three attorneys—Ronald L. Reilly, T. M. Kerrigan and the aforementioned J. L. Hammersly—which employed the attorneys to contest the validity of the will. The contest was begun November 20, 1933, and was successful. See *In re Kelly's Estate*, 150 Or. 598, 46 P. (2d) 84. One of the provisions of the contract between the heirs and the attorneys required the former to pay to the attorneys, in the event of success, "50 per cent of any money, property, bonds, stock or other assets which the said P. J. Kelly left to one Jessie G. Northrop, under the terms of said will or its equivalent in cash, said amount of cash equivalent to be agreed upon by the parties hereto at the time of distribution of said estate, and that such sum or property shall be the entire fee of second parties." It will be observed that the size of the fee was one-half of the recovery from Mrs. Northrop —not one-half of the estate.

After the circuit court entered its decree in favor of the contestants, the order which appointed the executors was revoked and Hammersly was appointed administrator. Reilly and Kerrigan became his attorneys. The appointment of Hammersly was made April 27, 1934, and on the next day, pursuant to the requirements of § 11-211, Oregon Code 1930 (now § 19-218, O. C. L. A.), he filed an undertaking signed by himself and this appellant in the denomination of $60,000, which said:

"The Condition of the above Obligation is such that Whereas Joseph L. Hammersly has been appointed by the Circuit Court of Multnomah County, Oregon, Administrator of the Estate of the Said Plympton J. Kelly,

"Now, if the said Joseph L. Hammersly shall faithfully perform his trust as such Administrator according to law, then this obligation to be void, otherwise in full force in law."

Concurrently with the filing of the bond, Hammersly and the appellant effected an agreement between themselves, pursuant to § 101-1402, O. C. L. A., whereby the appellant enjoyed with Hammersly joint control over all the personal property of the estate. Thereafter the administrator's checks bore the signature of both defendants, and Hammersly could gain access to the vault in which the securities belonging to the estate were kept only with the consent of the surety.

Two and one-half years after the entry of the final closing order this suit was filed. The sentence of the complaint which we now quote makes the charges of principal consequence in this appeal (the individual named McClure, mentioned in the sentence, was a

nephew of Plympton J. Kelly's deceased wife and is not concerned with this appeal):

"* * * at a time unknown to plaintiffs the said Hammersly conspired and agreed with the other attorneys that the said Hammersly as administrator should instead of distributing the entire net amount of said estate to said heirs at law and McClure and under pretense of paying to the said three attorneys the amount of property or fees due them under said contract of retainer, pay and make over to himself and said other two attorneys a disproportionately large amount of the property of said estate to the injury and detriment of the said heirs at law; that they should prevent and discourage the said heirs at law from knowing about said unjust distribution by preventing them from having a complete and full knowledge and access to the details of said estate, and by misleading them from time to time about said details."

The plaintiffs contend that the attorneys, under a pretense of distributing to the heirs one-half of the Northrop bequest, gave to them far less than one-half and kept the other part themselves. The complaint submits three main contentions: (1) Hammersly paid to himself and his two associates wrongfully $4,000 in fees; (2) Hammersly, in splitting up between the heirs and the attorneys the recovery from Mrs. Northrop, deceived the heirs into accepting a part which was less than one-half; and (3) Hammersly never accounted for all assets that came into his possession. We shall now state the second contention with more particulars. The heirs say that although the order which approved the final account and the vouchers which they signed at that time contemplated that they should receive into their hands all assets of the estate and then pay the attorneys, Hammersly did not follow that procedure. To the contrary, he delivered to each heir items which

he falsely represented amounted to one-half of the heirs' share. Three days before this occurred Hammersly's final account had been approved. In making this split-up Hammersly employed the inventory and appraisal which were filed in 1933. But by September of 1935, when Hammersly made the split-up, the bonds had increased in value $10,303.66. The heirs claim that they were ignorant of that fact and that the attorneys were aware of it. Hammersly and his associates kept the bonds.

It is principally upon the circumstances just mentioned that the plaintiffs rely to sustain their statement that Hammersly "paid and made over to himself and said other two attorneys a disproportionately large amount of the property of said estate." One-half of $10,303.66 added to $4,000 produces $4,045.33 less than the amount of the judgment—$13,197.16. The size of the latter is due not only to the two items just mentioned, but also to the fact that the circuit court found that Hammersly failed to account for all assets that came into his possession. We shall now review the evidence, but for the time being will confine ourselves to the first two charges.

August 15, 1935, Hammersly, as administrator, filed his final account. No objections were offered, and on September 16, 1935, an order was entered which allowed additional fees, found Hammersly's final accounting "in all things regular," and directed him to make distribution "according to law." About the same time L. B. Kelly signed a voucher, dated September 19, 1935, which said:

"* * * do hereby acknowledge to have received from Joseph L. Hammersly, administrator of the estate of Plympton J. Kelly, deceased, one-third part of all

money and other property remaining unappropriated and in the hands of said administrator and belonging to said estate, and I do hereby release and dismiss the said Joseph L. Hammersly as administrator as aforesaid and his surety  *   *   *.''

L. J. Kelly, Lloyd Woodside and Gertrude Hunter signed similar vouchers, with the exception that the one signed by each of the two heirs last mentioned acknowledged receipt of a one-sixth part of the estate.

October 22, 1935, a final closing order was entered, which declared:

''*  *  *  it is ordered that the above-entitled estate be and the same is hereby closed, and that the said administrator be discharged, and that the said bondsman be exonerated  *   *   *.''

In June, July, August and September of 1935, preceding the distribution of the estate, four meetings were held by the heirs and the attorneys in Reilly's office. The September meeting was on the 19th of that month, three days after the entry of the order which approved the final account. The heirs claim that they had no actual notice of the filing of the final account, of its contents or of the time for the hearing. We believe that their claim is true. But, for reasons which will later become apparent, the final report, if read, would not have given them information of consequence concerning a distribution of the estate. According to the appellant's brief, the order of approval directed ''that the estate be distributed: one-third to L. J. Kelly; one-third to Lou Kelly; one-sixth to Lloyd Woodside; and one-sixth to Mrs. Gertrude Hunter; they being the only heirs of the deceased.'' Although those directions should have been in the order, they were absent and were not followed in the distribution.

We have just mentioned four meetings. Generally, they were attended by the heirs, their wives and the three attorneys. Kerrigan and possibly Reilly were absent from one; in fact, Kerrigan was away from the state for about two months while the transactions which we are describing were occurring. Reilly presided over the meetings and spoke for the attorneys. At the September meeting an accountant, whose name is Hertz, was present. He had assisted Hammersly with some of the estate records. Although nothing was said in the June, July and August meetings about a split-up of the recovery from Mrs. Northrop, Hertz helped in the September meeting to compute the details of the one which was put into effect. Up to that time the discussions had been about a distribution of the estate. It will be recalled that the attorneys were interested only in the Northrop bequest which was about one-half of the estate. Manifestly, a distribution of the estate among the four heirs would have been quite different from a split-up of the Northrop bequest among the attorneys and the heirs.

The occupation of the heirs had been for the most part farming. None of them had had experience of consequence with bonds. In the June meeting the attorneys urged the heirs to agree upon a division of the property. They especially mentioned the real property, which consisted of two ranches and some tracts in Portland. Each heir was given a copy of the combined inventory and appraisement. The attorneys told the heirs that the closing of the estate would be hastened if they would agree upon a division. Let us now consider how the attorneys brought about a division between themselves and the heirs of the Northrop bequest.

■ First of all it is worthy of observation that a fiduciary relationship existed between the attorneys and the heirs. The appellant argues that that relationship was terminated when the court entered its decree holding the Kelly will invalid. We do not so construe the situation and believe that the attorneys administered upon the estate as part of the contractual duty which they undertook when they signed the aforementioned agreement. When Hammersly became administrator the fiduciary relationship between him and the heirs became two-fold. He was still one of the heirs' attorneys and as such he, like Reilly and Kerrigan, owed to them the utmost good faith. As administrator, he took upon himself an additional fiduciary relationship. The principle is thus stated in *Matthews v. Taylor*, 142 Or. 483, 20 P. (2d) 806, from which we now quote:

"An executor or administrator is trustee of the heirs, interested in an estate, or beneficiaries of the will that is being administered. Wells v. Wood, 125 Or. 38, 46 (263 Pac. 54); Re Roach's Estate, 50 Or. 179, 186 (92 Pac. 118). And it is the duty of the trustee in dealing with beneficiaries to fully inform them in regard to the value of the property and the nature of their interest in it. Jones v. Byrne, 149 Fed. 457, 465; Ludington v. Patton, 111 Wis. 208 (86 N. W. 571, 580)."

See also Bogert on Trusts and Trustees, § 12.

From the above it is clear that the heirs had a right to believe what the attorneys told them about the estate. Our examination of the record convinces us that they reposed complete confidence in the attorneys.

One factor which caused the heirs to forego the bonds and accept the real property was the attorneys' repeated advice that a voluntary division of the realty would save expense and hasten a closing of the estate.

The heirs accepted that advice and selected all of the real property. Only a part of it was included in the Northrop bequest, and since the attorneys' fee was based upon one-half the value of that bequest, they were interested only in the part which had belonged to the invalid bequest. The advice concerning the ranches and city tracts was accompanied with statements, variously phrased, that the bonds were of low grade, and that many of them were worthless. Although the attorneys had a detailed record which showed what bonds, etc., were still left of the Northrop recovery, the heirs had none. By the time of the four meetings several bonds which had formed a part of the Northrop recovery had been sold by Hammersly for sums which had not been mentioned to the heirs. Likewise two quantities of wheat, represented by warehouse receipts, which were also a part of the Northrop bequest had been sold for prices not disclosed to the heirs.

Some of the corporations whose bonds were held by the estate were said by the attorneys to be bankrupt and under reorganization. Reports made by creditors' committees of these corporations were displayed at the meetings. Two of the municipal corporations whose bonds were held by the estate were also in trouble. A report written by a bondholders' protective committee of the city of Astoria was brought before one of the meetings. It urged a reduction of interest rates and an extension of time. The statements just mentioned concerning the municipalities and insolvent corporations were true. But they were so mingled with references to the bonds in general that they caused the heirs to view all of the municipal and corporate bonds with disfavor. The attorneys mentioned some papers concerning reorganization, reduction of interest rates, etc., which

they said would have to be signed by whoever eventually received the bonds. The general trend of the representations induced the heirs to believe that these securities were of low value and possibly undesirable. We, of course, mean the corporate and municipal bonds, not the government issues. We are satisfied that the heirs mistakenly believed, in September, 1935, that the bonds were worth no more than the amounts indicated in the inventory and appraisement filed in 1933. But by September, 1935, as we have already said, the bonds had actually increased in value $10,303.66, a fact which the attorneys did not disclose to the heirs. Prior to September, 1935, Hammersly, as administrator, had sold, pursuant to an order of the court, many bonds forming a part of the Northrop bequest, which were of the same kind as those to which we have been referring. He received for them prices much higher than the values which the appraisers placed upon them. That development, as well as other circumstances, informed at least Hammersly and Reilly that bonds of this kind had increased substantially in market value since 1933, and that the appraisement was no longer a correct index to value. Neither the prices obtained nor the identity of the bonds was mentioned to the heirs.

We have mentioned the fact that the attorneys recommended to the heirs that they agree upon a division of the estate and that while they were so urging they especially mentioned the real property. Reilly, referring to the July meeting, swore: ''It was decided at that meeting what pieces of real property each one of them wanted, and that the rest of them were to— that all that they wanted outside of that was cash or its equivalent.'' That having been settled, the attorneys next busied themselves with the preparation of

the administrator's final report. The August meeting was not an important one. Kerrigan and possibly Reilly were absent from it.

We come now to the September meeting. In its course the aforementioned Hertz retired to a private room with Kerrigan. After an hour or so Kerrigan returned and handed to each heir a slip of paper upon which had been written the items belonging to the estate which it was proposed that he (the heir) should take as his share. The lists were prepared in the private room. Hertz and Kerrigan swore that Woodside helped in the compilation of the list. Woodside denied their statements. We are inclined to believe that he told the truth. But if he helped with the figures, he acted in ignorance since he, like the other three heirs, had no truthful information concerning the value of the bonds. Likewise neither he nor they knew what items of the Northrop bequest remained in the estate. Upon each slip there was entered, among other items, the parcel of real property for which the heir had expressed a preference. The one given to L. J. Kelly reads:

| "Maupin ranch | $ 8,250.00 |
| Rosenberg note | 82.48 |
| Government bonds | 1,255.00 |
| Cash | 2,318.58 |
| Total | $11,906.06" |

Thus, about 70 per cent of L. J. Kelly's share was real property. A similar portion was given to L. B. Kelly. Approximately one-half of Mrs. Hunter's part was real property and about one-sixth of that given to Woodside was realty. The realty and mortgages had not increased in value since 1933. None of the lists given to the heirs contained any of the corporate or municipal bonds.

It is seen that the lists did not contemplate a distribution of the estate, in compliance with the court's order. They looked forward to a division of the Northrop bequest between the heirs and the attorneys and a distribution to the heirs of all remaining parts of the estate. In other words, the lists included not only property recovered from Mrs. Northrop but also the heirs' distributive part of the remainder of the estate. Such a proposition had not been discussed at any of the conferences; unless an occasional loose word found in the transcript of evidence denotes consideration of that subject. Seemingly, a split-up of the Northrop bequest was not in the attorneys' minds when they obtained from the probate judge the final order of approval two days before the September meeting. That order called for a distribution of the estate among the heirs, and not a split-up. When Hammersly was asked why he did not comply with that order, he replied: "We drew up—well, I wouldn't say it was exactly a formal—not stating the amounts that they had received—very informal —and the other matters they hadn't figured out, these slips, and one thing or another, or something like that, they hadn't got them prepared, or something, and they were very anxious to get the estate closed so we could make a distribution." The other two attorneys were not asked the direct question which was submitted to Hammersly and which produced the answer just quoted.

■ The items which the attorneys purposed to keep in the non-discussed split-up were not mentioned at the meeting and no paper was exhibited showing their intended shares. The municipal and corporate bonds had not been seen by any of the heirs. As we shall later show, a computation of several records is necessary in order to ascertain the value of the items which

the attorneys kept for themselves. The attorneys claim that in the course of the four meetings the heirs agreed that in the distribution the appraised values should be employed. We do not believe that an agreement to that effect was ever made, but if it was it was immaterial because the attorneys concealed from the heirs the bonds' increase in value.

As we have said, it is difficult to ascertain from the probate record the items which the attorneys kept. Near the beginning of the trial the trial judge said: "Where is this statement of the final settlement you had, so I can follow this a little better. Have you got anything here which would indicate to me what the attorneys got and what they got so I can have them segregated?" His request for that information was repeated several times during the trial. When Reilly was upon the witness stand the trial judge declared: "Inasmuch as this final account and order does not divulge in detail what happened to this estate, would you make up a statement of exactly what each heir received, what expenses were paid for this, that, and the other, and what you attorneys received. It has not been done yet. Will you do that for me, regarding that estate?" Shortly he added: "This final order or final account here is mixed up so that I can't figure it out myself. I have had a good deal of experience with probate matters. You draw me up a statement * * *." Hertz, while upon the witness stand, produced a sheaf of penciled sheets in explanation of the accounts which caused the trial judge to remark: "Well now, if I can get what I asked for yesterday, either from this man or you attorneys, a final account, it will save a lot of time. That sheet there is just as much Greek to me as the other." During Hertz' cross-examination the trial

judge said: "Now I requested Mr. Reilly to give me a final account. Now this accountant here can help get the final account here so we can understand it * * *. I would suggest we let him go off the witness stand, unless there are some other questions you want to ask particularly, and get that account out and let's find out how it was distributed. * * * Now that is simple." The request was never met. The order approving the final account, and the final closing order do not indicate what either the heirs or the attorneys received.

When the alleged split-up took place the heirs had seen none of the papers composing the estate's files except the inventory and appraisement. It seems that a copy of the final account was in the office where the September meeting occurred. We agree with the trial judge that it does not divulge the disposition which was made of the estate.

We now return to the September meeting and the lists which were handed to the heirs. Seemingly, no discussion occurred when the slips were produced. The heirs silently acquiesced. For instance, one of them testified: "I figured that when he gave me the slip there, why, I figured that was the stuff we would get. * * * We had lawyers; we got you lawyers to figure all those things. That is one reason why we didn't do more figuring ourselves. We trusted you boys." Another of the heirs testified: "I left it to the attorneys." The testimony of these two heirs reflected the attitude of all four. Without discussing the matter they accepted what the attorneys offered, through their confidence in the latter. It was in this way that the division took place and the attorneys got the municipal and corporate securities.

■ The memorandum decision of the trial judge states with clarity the remaining facts that need mention. The commendable interest which he displayed in eliciting the facts entitles his decision to great weight. We now quote:

"* * * All the physical assets up to that time, including bonds, etc., were in the custody of Hammersly, and were not exhibited to the heirs at the time of the so-called settlement. The administrator and the two attorneys did not divulge to the heirs at the time of the settlement that these bonds had increased in value, although from the evidence it appears that they had actual knowledge of such increase in value of some of the bonds. The heirs, prior thereto, had no experience in regard to bonds or their values, and they relied upon the administrator and his attorneys in all particulars. At such meeting, Mr. Hertz, an accountant, selected by the administrator, went over the accounts in the presence of at least one of the heirs and made up a list of this and that, an explanation of which he could not give at the trial, and the meaning of which the court does not understand. Later, each heir signed a general receipt that he had received his distributive share, there being no enumeration of the various items each had received. The record is silent upon what the administrator or the other two attorneys received as their share of the estate. The evidence shows that after the final account was filed moneys were received and disbursed by the administrator, but the probate record is silent as to these transactions, no further report being made and no further order being entered other than an order closing the estate and exonerating the bondsman, dated the 22nd day of October, 1935.

"Later on, in 1937, the heirs discovered for the first time that the administrator and his attorneys, instead of receiving fifty per cent, had received greatly in excess thereof, whereupon the present suit was instituted."

We are satisfied that because of their ignorance of the true value of the bonds the heirs accepted as their shares of the estate properties which were substantially less in value than should have been given to them. Their ignorance likewise induced them to file no objections to Hammersly's final account.

We shall now state briefly the facts concerning the $4,000 which Hammersly disbursed in the form of fees. As we have said, the plaintiffs base their claim to equitable relief, not only upon misrepresentations concerning the value of the bonds, but also upon a claim that Hammersly and his two associates surreptitiously took from the estate $4,000 in fees. The appellant concedes that the $4,000 was taken. It and the attorneys justify the taking on the ground that $2,000 consisted of an administrator's fee and the other $2,000 was a fee to Reilly and Kerrigan for their services to Hammersly, the administrator. The decree from which the appeal has been taken, in surcharging the administrator with this sum ($4,000), held that the contract from which we have already quoted contemplated that no additional charge would be made by the attorneys for administration upon the estate. We add that before Hammersly was appointed the aforementioned Mrs. Northrop and her associate, as executors, had performed a substantial part of the work of administration. They were paid approximately $5,000 for their services.

The heirs had no knowledge of Hammersly's intention to charge for his services as administrator; nor of the intention of the other two attorneys to charge for their services to Hammersly. Seemingly, the attorneys entertained no thought at the outset of making a charge for their services in this representative ca-

pacity. For instance, Reilly, as a witness, in explaining what he said to the heirs, after Hammersly's appointment, about the possible charges against the estate, testified: "The heirs were informed in a general way there were certain items of expense, for instance, the exact amount of the inheritance tax of each of the heirs, and the exact amount of the estate tax, and I believe at that time there was some question about whether or not a sufficient amount of income tax had been paid to the federal government. But in a general way they were given to understand approximately the share that each would receive." It will be observed that he said nothing to the heirs about an administrator's fee nor an attorney's fee to be charged in connection with the administration. Yet such a sizeable sum as $4,000, had it been in mind, seemingly would have been mentioned. When the first half of the $4,000 was taken, no claim was made that it was exacted in connection with administration. This first $2,000 payment was taken pursuant to an order entered by the probate department June 19, 1934, which said:

"It is hereby ordered and adjudged that L. J. Kelly be allowed, out of the funds of the estate, the sum of $2,000.00 dollars for on account upon attorneys' fees incurred by him in the contest of the will of P. J. Kelly, deceased."

Note should be taken that the allowance was not for administrative services, but for services "in the contest of the will" and that the allowance was not to the attorneys, but to L. J. Kelly, a brother of the deceased, who was not an attorney. The order of allowance was made pursuant to a petition "allowing your petitioners the sum of $5,900.00 as a reasonable attorneys fees for vacating and setting aside the said purported will."

On the same day that the order was entered Hammersly, as administrator, drew a check for $2,000 payable to L. J. Kelly, who endorsed it and handed it to the attorneys. They cashed it without endorsing it. Kelly, concurrently with his endorsement of the check, signed a receipt which acknowledged payment of $2,000 "ac't court order June 19, 1934, atty. fees will contest." The attorneys admit that, since their contract entitled them to 50 per cent of the Northrop bequest as compensation for their services in contesting the will, they were not entitled to this $2,000 payment.

The trial judge, in order to make sure that the $2,000 was actually accepted on account of the contest of the will, made several inquiries of Reilly when he was upon the witness stand. For instance, he asked whether L. J. Kelly was an attorney. The answer was: "No. Mr. Kelly was allowed $2,000 for breaking of the will of Plympton Kelly, deceased." Next, the trial judge inquired: "Why did you run it through Kelly in this round-about way? Why was that necessary?" The answer follows: "The situation was at the time of the allowance there was no indication that we would be successful in the Supreme Court. It was still in litigation." Thus, it is seen that the $2,000 was taken so that the attorneys would have some compensation for their services in the event that this court reversed the circuit court's decree. In other words, the $2,000 was obtained, not for services rendered in administration, but wrongfully for services covered by the 50 per cent contract which was previously quoted. We come now to the second $2,000 payment.

July 25, 1935, the probate department, upon the petition of Hammersly, authorized him "to withdraw the sum of $2,000 which said sum is to be paid $1,000 as

partial payment for the administrator of said estate and $1,000 as attorneys' fees for the legal services in connection with said estate." That order was made pursuant to a petition signed by Hammersly which recited:

"Your administrator further represents that he has successfully carried on the estate through a contest of a will now on appeal to the Supreme Court and performed extraordinary services on behalf of the estate of P. J. Kelly, and is entitled to extraordinary compensation so rendered, and that your administrator has employed attorneys who have performed extraordinary services, and are entitled to compensation for their services."

Again it is seen that no mention was made of the special agreement whereby the attorneys were to be compensated with one-half of the bequest made to Mrs. Northrop, and likewise it is seen that fees were asked again upon a representation that they were earned in contesting the will. In his final accounting Hammersly said: "At the time the said purported will was set aside by order of this court, the court allowed L. J. Kelly, as contestant, the sum of Two Thousand ($2,000.00) dollars, to be allowed on attorneys' fees for the successful contest of said will." It is worthy of notice that the paper said that the allowance was to "L. J. Kelly, as contestant." It will be recalled that it was the attorneys, and not Kelly, who obtained the money. L. J. Kelly did not testify, he having died six months prior to the trial. The final account, after mentioning the order of July 25, 1935, closed with a prayer that the court allow additional attorneys' and administrator's fees. The order which approved the final account allowed Hammersly, as administrator, an

additional $1,000 and his attorneys a similar sum. Thus, we see that a total of $6,000 was allowed. The attorneys explained that only $4,000 was actually taken and that this procedure was employed because the original $2,000 was not deductible in the measurement of the inheritance taxes. However, it was never returned. Seemingly, it was the third allowance which was not taken.

Mr. Reilly, one of the three attorneys, in a letter to the appellant, mentioned the three orders totaling $6,000 in fees, and the $4,000 which was taken from the estate. Referring to the last of the three above-mentioned orders, he wrote:

"* * * It was stated in open court that this sum of $2,000 would not be in addition to the $2,000 allowed to Mr. Kelly for the breaking of the will but would be in substitution for that sum, to avoid controversy with the State Inheritance Tax Department. This was done and the attorneys and administrator received nothing in addition, out of the assets, above the $2,000.00 check to which I have referred.

"In settlement of the fee of the attorneys with the heirs, this $2,000 was deducted from their fee as already having been received by them so that, in reality, the entire $4,000.00 has been fully accounted for and the heirs will be unable to show that any attorney fee or administrator fees were charged against the heirs outside of their contract agreement."

We do not agree with the statement just quoted: "the heirs will be unable to show that any attorney fee or administrator fees were charged against the heirs outside of their contract agreement." We are satisfied that $4,000, in addition to the contract sum, was taken from the estate.

The trial judge, in his memorandum decision, referring to Reilly's letter, said:

"The $4,000 attorneys' and administrator's fees are not to be deducted inasmuch as the entire fee mentioned in the contract covered this item, as was clearly admitted by the letter of January 3rd, 1938, written by Mr. Reilly to the bonding company."

We concur in that interpretation of the agreement.

We are satisfied that the heirs had no knowledge that anything was being asked in the final accounting for administration services. The contract and the course of conduct pursued by the attorneys induced the heirs to believe that no charge of that kind would be made. Those being the circumstances, the heirs did not examine the final account in search of entries pertaining to fees, and likewise made no objections to the final accounting.

The above concludes our review of the evidence. We regret more than print can indicate the necessity of writing anything which reflects upon these three attorneys. In interpreting what we have written it must be borne in mind that Reilly and Kerrigan are not parties to this proceeding. Lest words chosen by us might not reflect correctly what was in the mind, we have in many instances employed the language of the attorneys.

It will be observed that the heirs, trusting their attorneys, (1) accepted as their shares of the estate the items of property entered upon the slips which the attorneys distributed at the September meeting, and thus received less than their shares; (2) were ignorant of the fact that the attorneys took from the estate $4,000 in fees; (3) were unaware of the fact that the

attorneys received more than one-half of the Northrop bequest; (4) did not know that they (the heirs) had been deceived and that they possessed valid objections to Hammersly's final account and to his subsequently presented petition to be discharged; (5) being the victims of deceit, they (the heirs) made no objections to the final account and to Hammersly's petition for his discharge, and in this way orders favorable to Hammersly were entered which would not have been entered had the truth been known.

■ The appellant's first contention is:

"The order of final settlement of an administrator's account is a final judgment not subject to collateral attack except for extrinsic or collateral fraud."

Yielding to the order of final settlement the same efficacy that attaches to judgments and decrees of courts of law (*In re Anderson's Estate*, 157 Or. 365, 71 P. (2d) 1013; *Froebrich v. Lane*, 45 Or. 13, 76 P. 351, 106 Am. St. Rep. 634; and *Conant's Estate*, 43 Or. 530, 73 P. 1018), yet, according to *Froebrich v. Lane*, supra, such an order is subject to be set aside if it was "superinduced by fraud, and the complainant is free from inattention, negligence and fault upon his part."

From § 510, Restatement of the law, Judgments, we quote:

"Subject to general equitable considerations (see §§ 516–519), equitable relief from a valid judgment will be granted to a party to the action injured thereby if the judgment was based upon a fraudulent claim or defense which he did not litigate because he

"(a) was fraudulently misled by the other party to the action to believe that he had no claim or defense, or

"(b) * * *."

From the Comment which accompanies the statement just made, we quote:

"The rule stated in this Clause (a) is not limited to the cases mentioned in this Comment but applies to other situations where in fact there has been no contested litigation owing to the successful fraud of one of the parties. * * *"

Among the illustrations which follow this Comment, we find the following:

"A is trustee for B, who has no reason to know that A has embezzled funds from him. In the settlement of the trust estate A makes a final accounting in which he fails to mention a number of business transactions involving profit for the estate, such transactions not having been entered upon his books. Judgment is rendered in accordance with the improper account. After it is too late to take further proceedings in the action, B discovers the facts. Equitable relief may be granted to him."

We have carefully studied the authorities cited by the appellant, especially *Froebrich v. Lane*, supra, but do not believe that they are out of harmony with § 510 of the Restatement. This court, in stating the legal principle under consideration, employed language similar to the Restatement. See *Oregon-Washington R. & N. Co. v. Reid*, 155 Or. 602, 65 P. (2d) 664, and *State v. Vincent*, 152 Or. 205, 52 P. (2d) 203. For an excellent treatment of the subject see Pomeroy's Equity Jurisprudence (5th ed.) §§ 919a and 919b.

■ The principle of equity jurisprudence of which we have just taken notice subjects the order of final settlement to the attack made upon it by the plaintiffs. The administrator and his attorneys, by misleading the heirs as to the value of the bonds, induced them, not only to permit the attorneys to retain bonds worth

$10,303.66 more than the representations indicated, but in addition deceived them into a belief that they had no objections to his petition for his discharge. Had they not been deceived they would have known that they possessed objections which, if voiced, would be sustained. The same observations are true concerning the improper allowance of the administration fees. The petitions upon which those allowances were made likewise caught the heirs in a false state of security. The attorneys' disregard of their contract, which limited their compensation to 50 per cent of the recovery from Mrs. Northrop, was a development which the heirs were not bound to anticipate: *Froebrich v. Lane*, supra. They did not know of the presentation by the attorneys of the unwarranted petitions for fees, and accordingly neither knew that they ought to object nor that they had occasion for objection.

It was in the manner just described that Hammersly obtained the order which approved his final account and obtained the next order which discharged him. Valid objections to the petitions for both orders existed, but misrepresentations concealed the objections from the heirs. Reverting to § 510 of the Restatement, it will be observed that equity grants relief from a judgment if the plaintiff in the equitable suit was "fraudulently misled by the one party to the action to believe that he had no claim or defense." We believe that that principle is directly applicable to the situation before us. The misrepresentations continued to deceive the heirs until it was too late for them to take any action in the probate court. That being true, the circuit court was authorized to impeach the orders which approved the final account of Hammersly, discharged him and released the appellant as his surety.

■■ Finally, the appellant contends that the undertaking which it signed does not render it liable for the fraud which was practiced upon the heirs in the distribution of the estate. It claims that Hammersly's act in splitting up the Northrop bequest between the heirs on the one side and the attorneys on the other was no part of his duties as administrator. We quoted in a preceding paragraph the material part of the undertaking which the appellant signed. Section 19-218, O. C. L. A., pursuant to which the undertaking was given, renders sureties nonliable "upon the condition that such executor or administrator shall faithfully perform the duties of his trust according to law." The appellant is not like a private surety who signs a bond as an accommodation, but is a compensated corporate surety. A surety of the kind first mentioned is a favorite of the law and is the beneficiary of the rule of *strictissimi juris*. But the other type of surety is dealt with in a different way. *Fitzgerald v. Neal*, 113 Or. 103, 231 P. 645, and *Neilson v. Title Guaranty & Surety Co.*, 81 Or. 422, 159 P. 1151. Judge Parker, in *Maryland Casualty Co. v. Fowler*, 31 Fed. (2d) 881, 63 A. L. R. 1375, in stating the manner in which a compensated surety is regarded by the law, said: "A compensated surety is in effect an insurer." He added: "Its contract will be construed as an insurance contract most strongly in favor of the party or parties protected thereby." In other words, a compensated surety is taken at his word. Such construction of the appellant's undertaking does not add to its liability but makes it liable to the same extent as the administrator whose signature is alongside that of the appellant's.

The appellant, in support of the contention which we have just stated, cites decisions which we shall now

review. *Culver v. Culver*, 58 Ohio St. Rep. 172, 50 N. E. 505, was a suit instituted for the purpose of compelling the defendant (L. A. Culver) to render an accounting. Twenty-six years before the institution of the suit the defendant and his brother were appointed executors of the estate of their deceased father which was bequeathed to his three sons and a daughter. Twenty years before the filing of the suit the four heirs signed a contract in the form of a family agreement. It wrought a settlement of some claims held by the defendant against his sister and brothers and a division of some of their father's estate. One of the clauses of the agreement said:

"Now for the purpose of making a full and final settlement of all claims, or demands owing to the said L. A. Culver by either of the other parties * * * it is agreed and understood that any and all claims or demands owing by any of the aforesaid parties to L. A. Culver or owing by him to any of the said parties are hereby canceled and discharged without regard to the manner in which claims and demands arose or how they are evidenced. * * *"

Nineteen years after this writing was signed the defendant's sister died, and fifteen years after the writing the defendant's brother, who had served with him as joint executor, died. During the lifetime of those two persons no one claimed that the defendant was still executor of the estate, but after the death of the second of them the suit under review was filed by the widow of the deceased brother who had served as joint executor. The court held that whatever the defendant had done after the execution of the writing concerning his brothers' and sisters' property was done by him as their agent and not in the capacity of executor of his deceased father's estate.

*Hebert v. Hebert*, 22 La. Ann. 308, was an action upon an administrator's bond. The administrator, in order to facilitate partition of the estate, had, upon the request of the heirs, sold the estate's assets; but upon terms and conditions materially different from those permitted by law. The court held that this departure rendered him the agent of the heirs and that, therefore, he made the sale as agent and not in his capacity of administrator. It was held that there was no liability upon the undertaking. The part of the decision upon which the appellant relies says:

"The surety signs the bond with reference to the law regulating the duties of the administrator, and securing his own recourse against the latter. He knows that the law requires the administrator to sell property for cash or on twelve months' credit."

*Durfee v. Abbott*, 50 Mich. 479, 15 N. W. 559, was an action of debt on a bond. The defendants were the executor and his sureties. The will created, among other items, two bequests payable in two years. At the appointed time the executor delivered to each of the legatees, not cash, but his promissory note payable two years hence, and they accepted the notes in lieu of the legacies. One of the legatees was a minor, the other was of age. Concerning the latter, the court held that her acceptance of the note released the sureties. In so holding it said:

"It was not lawful to deal with the principal in such a way as to change the terms of his liability, without the consent of the sureties."

*Schwartz v. Schwartz*, 104 Conn. 271, 132 Atl. 461, was an appeal by two legatees from an order which approved as corrected the administrator's final account.

Each legacy was $1,990.45, but each was paid only $490.45. The other $1,500 was credited by the administrator, with the consent of the legatee, upon the purchase price of a business which the legatees were purchasing from him. The transaction was free from misrepresentations and the conditions of the sale are described in the decision as completely fair. In sustaining the order which approved the final account, the decision said:

"There was no intrinsic illegality in the manner in which the appellee discharged his obligation to distribute to the appellants their respective shares in the estate. If, as apparently was the case, he held the balance for distribution in the form of cash, they might no doubt have insisted upon its payment to them in legal tender. But they might also agree with him upon some mutually satisfactory substitute plan, and, having done so, he is entitled to credit himself with payments made in accordance with it."

From *Pyke v. Searcy*, 4 Porter's Rep. (Ala.) 52, we quote:

"The administrator must perform his duties in obedience to the law, as defined and established:— it is to this that the condition of the bond refers, and not to any rule which may be agreed between himself and a creditor, or one interested in the estate. If a rule of adjustment should be agreed on between the administrator and a creditor, variant from the law, and which would go to change the scope of the surety's undertaking, to his probable prejudice, the surety would not be bound to a compliance. It is well settled, that the surety is discharged, if the creditor, without his consent, agrees to give time to the principal debtor."

The claim in controversy had been submitted to arbitration in a manner whereby the time of payment as a result of the arbitration was extended. The decision held that the surety was thereby released.

*Aetna Casualty Co. v. State,* 162 Md. 49, 158 Atl. 45, was an action by the state for the use of the legatee against the surety on the bond of administrators. The deceased was the husband of the legatee. One of the administrators was her son; he was appointed upon her petition; the other was a responsible attorney. The surety plead payment of the distributive share. Payment was made by a check in the full amount of the legacy which the administrators handed to the legatee. The latter endorsed the check, signed a release for her distributive share and shortly returned the check to her son. He cashed it and kept its proceeds. The court held that the legatee had received payment and that she was bound by the release.

*Estate of Yorba,* 176 Cal. 166, 167 P. 854, was based upon an application by a purported heir for the appointment of herself as administrator of an estate of a decedent who died 65 years before presentation of the petition. Shortly after the death the deceased's will was probated, an order was entered which settled the executor's accounts and the executor was discharged. The appellant based her petition solely on the ground that no order for the distribution of the estate was ever entered. The court held otherwise upon that as an issue of fact, and in addition said:

"Where as here the heirs and devisees have assumed to divide the estate among themselves, and their division has been acquiesced in and acted upon for many years by all parties at interest, we think they and their successors should be held estopped to question the validity of the disposition thus made."

The facts in *Parker v. Hardy,* 200 Wash. 318, 93 P. (2d) 431, which appellant cites but does not otherwise mention, are so dissimilar to those before us that

a review of that decision will yield nothing having a bearing upon the issues before us. The principles of law it employed are the same as those indicated in the decisions above reviewed.

*Tynan v. Kerns*, 119 Cal. 447, 51 P. 693, likewise arose out of facts so dissimilar to ours that nothing said in deciding the case can shed any light upon our problem. In that case a creditor, who presented her claim a month after the administratrix had been discharged, instituted the action under review to secure an annulment of the administration proceedings. She claimed that the administratrix had fraudulently underestimated the value of the estate as $5,000 when in truth the value was $25,000, and that in so doing she misled the probate judge into making the notice to creditors four months instead of ten months. She also claimed that the administratrix purposely published the notice to creditors in a newspaper which the plaintiff did not read. The court brushed these contentions aside, saying:

"We think that the actual notice which appellant had of the death of decedent, and the issuing of letters to respondent, administratrix, and the inventory, carried with it notice of circumstances sufficient to put appellant upon inquiry of the particular fact of which she complains, and she thus had 'constructive notice of the fact itself   *   *   *.' "

The part of the decision which the appellant quotes reads:

"At all of the various stages of the proceedings, at least until the final distribution of the estate, appellant had an adequate remedy had she exercised ordinary prudence and diligence in the protection of her rights. Equity will not relieve against culpable negligence or inexcusable laches. Ignorance of the alleged fraud will not excuse appellant's laches,   *   *   *."

It will be observed that the court found that the plaintiff was aware of all the material facts, whether or not there was any irregularity in the publication of notice to the creditors. For the sake of completeness, we add that appellant's brief says that the following support the statement which it quoted from *Tynan v. Kerns*, supra; *Hankins v. Layne*, 48 Ark. 544, 3 S. W. 821; *Belle v. Brown*, 37 Or. 588, 61 P. 1024; *Brenner v. Alexander*, 16 Or. 349, 19 P. 9, 8 Am. St. Rep. 301; Pomeroy on Equity Jurisprudence, pp. 538-542 and p. 2459. The only other citations which the plaintiff makes in support of the contention now under consideration are three sections of 24 C. J., Executors and Administrators. We will now take notice of them. Section 2562, p. 1067, says that a surety is not liable for acts of an administrator which were not performed within the scope of his official duties. Section 2571, p. 1071, states that the bond does not subject the surety to liability if the wrongful act was done by the administrator "in some other and distinct capacity." It adds:

"It follows that, where the property of the estate is transferred to, and retained by, the representative in another capacity, the sureties on the administrator's bond are released from further liability."

Section 2572, p. 1072, declares:

"The sureties are released by any conduct on the part of the persons interested in the estate or agreements by which the sureties' liability would be altered and increased. The acquiescence of a distributee in a wrongful application of trust funds by an administrator releases the administrator and his sureties from liability to such beneficiary, and where the person injured by the default of the representative has the means of satisfying the claim in his hands, and voluntarily surrenders it, he thereby discharges the sureties to the

extent of such means. Laches in proceedings against the principal may also release the sureties.''

Let us determine whether the authorities which we have just reviewed indicate that the circuit court erred when it entered the attacked decree.

We do not believe that we disagree with anything held in the above-mentioned decisions. We think, however, that the facts in none of them parallel those in the instant case. There comes to mind the wise observation made by Judge Curtis Bok's delightful character, Judge Ulen, which is thus reported:

''After five years on the Bench he found that this view had deepened. It was less a view, perhaps, than an accretion of consciousness. For one of his cases that was ruled by a pure point of law there were ten that were determined by the behavior and personality of the litigants. The more law that was made each year, the less important it seemed.''

Bok, Backbone of the Herring, p. 146.

Some of the above authorities deal with the equitable principle of laches. The appellant's brief mentions the same subject, but does not argue that the plaintiffs' suit was filed tardily. Our examination of the record satisfied us that the plaintiffs acted with the required degree of promptness.

The chief contentions made by the appellant are that its authorities demand a holding that (1) Hammersly did not act within the scope of his duties as administrator when he divided the Northrop bequest between the heirs and the attorneys; and (2) when the heirs accepted what the attorneys gave them and did not insist upon production of all the assets they released the appellant as surety on Hammersly's bond.

If either of those contentions is correct, then the circuit court erred.

It will be observed that the cases upon which the appellant depends, unlike the instant one, were free of distributees who had been deceived by an administrator into accepting as their distributive shares something less than the amount due. It is safe to assume that in each of them (especially *Durfee v. Abbott, Schwartz v. Schwartz*, and *Aetna Casualty Co. v. State*) the court would have reached a different result if it had appeared that the executor defrauded the distributee.

Although none of the authorities cited by the appellant declares that the act of dividing a bequest between an heir and one of his creditors, if performed by an executor or administrator, is outside the scope of his official duties and powers, yet we are prepared to believe that such must ordinarily be the case. We think that it is generally no part of an administrator's official duties to intervene in a misunderstanding between a legatee and one of his creditors. If he does, and if in settlement of the dispute he divides the bequest between the two, his act should ordinarily be attributed to some other relation than his position as the estate's representative. In that event, the surety upon his administrator's bond would not be responsible for his wrong if he committed one.

In proceeding we are going to deal with the alleged split-up as though the parties fully consummated it. The fraud, of course, denied it validity. Our ultimate goal, of course, is to determine whether Hammersly committed the fraudulent conduct in his relation as administrator; for unless he did the appellant is not liable for his guilt.

Now let us revert to the facts of this case. Directly bearing upon the question of whether Hammersly made the split-up in his capacity of administrator or in some other relation are five circumstances which we believe are controlling: (a) The false representations which deceived the heirs were made by Hammersly and his associates in the course of the aforementioned meetings which were held for the purpose of facilitating the administration of the estate; in other words, the false words were spoken by Hammersly as administrator while he was engaged in his work of administration. (b) The order of the probate department, as interpreted by the appellant, directed Hammersly to distribute the estate to the beneficiaries—not one-half of the estate, but all of it. Had he complied with that order fully instead of only partially, his act would have been performed in his official capacity and in the discharge of his administrative duties. His partial compliance with it, we think, was of no different kind. (c) The split-up was made in the course of a meeting which was called for the purpose of effecting a distribution of the assets and of bringing to a close the administration of the estate. It is a commonplace that both the distribution of the assets and the winding up of the administration are duties performed by the administrator and that they are embraced within the powers conferred upon him. (d) The slips of paper which Kerrigan gave to the heirs in the September meeting, and which it is said split up the Northrop bequest, mentioned not only items which had been a part of the Northrop bequest, but also other properties belonging to the general estate and in which Mrs. Northrop had had no interest. Likewise the attorneys had no interest in those items, for their 50

per cent share was confined to the properties which
had been intended for Mrs. Northrop. Thus we see
that the slips, in part at least, proposed a distribution
of the assets in obedience with the court's order.
(e) The split-up and the distribution were concurrent
acts. September 19, when the slips of paper were passed
around, the distribution did not take place. It may
be that some deeds were signed on that day (the evi-
dence is vague upon that subject), but the distribution
of the cash and contents of the vault had to wait for
two or three days until the appellant would lend its
necessary signature. Thus we see that the distribution
and the split-up were parts of the same act.

We have mentioned the fact that the attorneys
made their false representations while performing acts
of administration. They gained their intimate knowl-
edge of the assets and of the value of the latter while
in possession of the various items for the purpose of
administration. The bondholders' committees of As-
toria and of some of the insolvent corporations whose
bonds were owned by the estate sent their reports to
the attorneys because they were the representatives
of the estate. In turn, the heirs gave credence to the
attorneys' representations and weight to their opinions
because they observed that the attorneys possessed
intimate knowledge concerning the bonds.

■ We have no hesitancy in believing that since
Hammersly split up the Northrop bequest concurrently
with the distribution of the general assets for the pur-
pose of facilitating the latter and thus more promptly
closing his administration of the estate, his action was
within the scope of his powers. Both he and the heirs
so regarded it, and we know of no reason why we should
interpret it in any other way.

■ The appellant further contends that the authorities previously reviewed demand a holding that when the heirs were handed the slips of paper, which did not mention all of the assets, it was their duty, if they cared to retain the appellant's liability upon its bond, to demand that Hammersly produce all of the assets and distribute all of them. They argue that the heirs' failure to speak up and their acquiescence in Hammersly's proposed division of the Northrop bequest released it from its undertaking. Any other holding, so they claim, would alter and increase its liability.

The contentions just mentioned presuppose that the heirs and the attorneys, on September 19, effected some sort of an agreement which altered their previous relationship and which affected the appellant's liability. We do not, however, believe that anyone went to the September meeting for the purpose of entering into agreements nor for the purpose of altering any existing relationship. The meeting was called for the purpose of having Hammersly distribute the assets in his possession and the heirs went there for the purpose of receiving their portions. Moreover, the heirs were in no position to agree upon the terms of a split-up. The reason is this: they had no accurate information of what was left of the Northrop recovery and of the value of those items. As we have said before, both of the wheat warehouse receipts and several of the bonds which had formed a part of the bequest had been sold and the money had been spent. On September 19 the heirs had no knowledge of what was left and, unless we have overlooked some item of evidence, they were never told how much the wheat brought. It is a certainty that they were never told the price received for the bonds. Accordingly, to hold that these four farmers,

who were compelled to grope in the dark, had agreed upon the terms of a split-up with the three attorneys, who possessed accurate data, would yield a triumph to legalistic art over common sense. That is especially true in view of the fact that the attorneys did not tell the heirs what items they proposed to keep. We believe that the heirs told the truth when they testified that they trusted their attorneys, and trusting them, took what was given. They assumed that was the way the law operated. In other words, they were doing no bargaining and were making no agreements. The very fact that at the end of the meeting they signed receipts, and not agreements, strongly warrants the statement just made. It will be recalled that in the Culver case, upon which the appellant relies, the parties signed a formal agreement. In short, the heirs, at the September 19 meeting, acted upon the advice and promptings of their attorneys. It is our belief that no agreements were made on that day and that the heirs never did anything which altered the appellant's liability upon its undertaking.

In all of the decisions cited by the appellant the court sought to ascertain the real intention of the participants in the transactions under review. That is, they tried to determine whether the individual who made division of the assets was acting in his official capacity as administrator or in some other relation. In each instance the court viewed the transaction in exactly the same manner as any intelligent layman would have done. No strained or inappropriate interpretations of the transaction were sought. No novel legal principles were employed, with the possible exception of those in the Hebert case where the court was confronted with a Louisiana statute which made it unlawful for an

estate, in the sale of any of its assets, to extend credit for more than one year. We believe that it is likewise our duty in the instant case to seek the real intention of the participants in the meeting held on September 19. We have no hesitancy whatever in expressing the conclusion that everything which was done by Hammersly in the September meeting was within the scope of his duties and powers as administrator, and that the heirs did nothing which altered or increased the appellant's liability upon its undertaking.

The above disposes of all contentions advanced by the appellant. We have not mentioned all of the authorities upon which it depends, but gave careful attention to each of them. In our belief, no error adverse to the appellant was committed when the decree was entered. Lest it appear that the vouchers previously mentioned, which the heirs signed, and which Hammersly showed to the appellant before it released the assets, misled the appellant, we explain that those papers did not indicate the items of property which it was proposed the heirs should receive, and that the appellant knew when the vouchers were shown to it that the heirs had received nothing. Moreover, it does not appear that the heirs knew when they signed those papers that Hammersly intended to show them to the appellant.

The heirs' cross-appeal contends that the judgment should be increased $13,954.14. It presents three contentions. One concerns an item of $508.35 which is based upon a claim that an error of computation was made when the circuit court determined the amount of the judgment. The second claims that the attorneys were not entitled to any fee for the services which resulted in restoring to the estate the items of property

worth $13,391.59 which Mrs. Northrop claimed the deceased gave her shortly prior to his death. By including these items in the Northrop bequest the attorneys' fee was increased $6,695.79. The third claim amounts to $6,750 and is based upon the inclusion in the Northrop bequest of two parcels of real property worth $13,500, which the heirs say should be excluded in the computation of the attorneys' 50 per cent fee.

We shall now consider the first of these three contentions—the item of $508.35. This item grows out of the fact that Hammersly's final account erroneously totaled his "disbursements made during administration" as $13,396.85 when the true sum was $19,397.25. The trial judge, in determining the amount of the judgment which he entered, was misled by Hammersly's error and employed as the total of the disbursements $13,396.85. It will be recalled from an averment of the complaint quoted in a preceding paragraph that the prayer for judgment is based, not only upon the two irregularities of which we have taken notice, but also upon an averment that Hammersly did not distribute to the heirs the entire estate. In order to ascertain the amount of the judgment and whether the averment just noted was true, the circuit court made two separate computations based upon data found in Hammersly's records.

In the computation which we will now review the trial judge showed that (1) the appraised value of the estate was $90,005.87; (2) receipts and disbursements during administration converted that amount to $87,-220.78; (3) $10,303.66 (the increase in the value of the bonds) when added to $87,220.78 produces a total of $97,524.44 available for distribution; (4) the amount distributed by Hammersly to the heirs and the afore-

mentioned McClure was $61,718.18; and (5) the sum just mentioned when deducted from $97,524.44 leaves $35,806.26, the amount for which Hammersly failed to account. To that amount the trial judge added $4,000, the unwarranted attorneys' fee, creating a total of $39,806.26 for which Hammersly was chargeable. The other computation yielded a like result. It was based upon the value of items which the records showed that the attorneys kept.

Having determined that Hammersly was chargeable with $39,806.26, the computation next ascertained the amount of the fee to which the attorneys were entitled under their 50 per cent contract. A determination of that amount was necessary since the fee was a proper credit in Hammersly's favor against the charge of $39,806.26. Since the size of the fee was one-half of the Northrop bequest, the computation proceeded to ascertain how much Mrs. Northrop would have received had the will been sustained as valid. The total value of her bequest, before any deductions had been made, was determined as $67,051.44. In computing that sum, $10,303.66 was added to the original appraised value of the bonds. Since Mrs. Northrop was the residuary legatee, it was necessary to deduct from $67,-051.44 all expenditures made in the course of administration. To expenditures the trial judge added $7,-087.28, the inheritance taxes payable upon the Northrop bequest, but he deducted two sums aggregating $8,000 which would not have been incurred if the will had been sustained. In making the deduction of expenditures the court was misled by Hammersly's error in totaling his expenditures and deducted only $13,396.85. Hammersly's disbursements were, as we have already shown, $19,397.25. His predecessors spent $2,385.21.

The total of the two is $21,782.46, and that is the amount which should have been deducted at the place with which we are now concerned.

Continuing, the computation ascertained that the net amount which Mrs. Northrop would have received was $54,567.31. One-half of that or $27,283.65 was thus determined as the amount of the fee. As we have seen, the attorneys took from the estate $39,806.26. Deducting $27,283.65 from that sum we have $12,522.61, to which the court added $674.55 (sums paid to the three attorneys after the final account) and thus determined that $13,197.16 was the amount for which judgment should be entered.

In the cross-appellants' brief the circuit court's computations are analyzed and attention is directed to the erroneous use of $13,396.85 as the amount of disbursements during administration, whereas the correct sum was $21,782.46. The cross-appellants show, however, that the trial judge's computations made some deductions which are included in the sum of $21,782.46 and that when adjustments have been made the judgment should be increased $508.35. The brief filed by the surety in answer to the cross-appellants' brief does not question the accuracy of any of the computations which we reviewed nor of the need of adding $508.35 to the judgment in order to make it conform to the demands of the account.

We are satisfied that $508.35 must be added to the attacked judgment.

It is seen from the above that the attorneys took from the estate $4,000 in fees to which they were not entitled and kept the entire increase in the value of the bonds ($10,303.66) whereas if they had acted honestly they would have given to the heirs one-half the

increase or $5,151.83. The total of these two sums is $9,151.83. But we have just shown that the net amount for which Hammersly failed to account was $13,705.51 ($13,197.16 as computed by the trial judge, plus $508.35, due to his mistake in employing the erroneous amount of disbursements). Therefore, the difference between $13,705.51 and $9,151.83, or $4,553.68, is the amount improperly taken from the estate by Hammersly for which we can find no record whatever. The sum of $9,151.83 consists of $5,151.83, one-half the increase in the value of the bonds, plus $4,000, the unauthorized attorneys' fee. Thus, we see that we have three items: (a) One-half of the increase in the value of the bonds; (b) the $4,000 unauthorized attorneys' fee; and (c) $4,553.68, the amount taken for which we have no explanation whatever. The total of the three is $13,705.51 which should be employed as the amount of the judgment.

As we have said, the second contention of the cross-appellants is that the contract did not entitle the attorneys to any fee for causing Mrs. Northrop to return to the estate the property worth $13,391.59 which she claimed the deceased gave her shortly prior to his death. The trial judge included this sum of $13,391.59 in the total net value of Mrs. Northrop's share, $54,567.31. It will be recalled that one-half of that sum, $27,283.65, became the size of the attorneys' fee.

■ The successful character of the attorneys' services and their substantial value to the estate are not questioned by the heirs. Mrs. Northrop claimed that these items of property were a gift to her by the deceased. The attorneys contended that if a gift was intended by Plympton J. Kelly it was not completed prior to his death. Under threat of suit, and upon advice of

the heirs, a compromise was affected whereby the property was returned and the estate paid to Mrs. Northrop $3,000. If the gift was an incomplete one, Mrs. Northrop, under the will, would have received the property by virtue of the residuary clause in her favor. She was both a specific and a residuary legatee. We believe that no error was committed when the circuit court included these items in determining the total value of Mrs. Northrop's bequest.

We are satisfied that no error is revealed by the third contention. It is based upon a contention that in determining the value of the bequest made to Mrs. Northrop, one-half of which became the amount of the attorneys' fee, two parcels of real property situated in Portland should have been excluded. One of these was appraised as worth $11,500, and the other as $2,000. The heirs concede that at least the former would have become the property of Mrs. Northrop if the will had been declared valid. Both, by virtue of the distribution, became the property of L. J. Kelly who, in adjusting the distribution, gave a note to the attorneys in the denomination of $6,750 secured by a mortgage upon these two parcels. The attorneys sold the note and mortgage to an assignee who foreclosed the mortgage when Kelly defaulted. This assignment of error is based largely upon three contentions: (a) the two tracts were appraised for more than their value; (b) the attorneys wrongfully took the mortgage; and (c) through the foreclosure Kelly lost the benefit of the distribution. They argue that ''in equity and good conscience'' $6,750 should be added to the judgment. We have considered the merits of all these contentions, but are not satisfied that they possess any merit.

The above disposes of all contentions submitted by the parties. It follows that the decree and judgment of the circuit court must be increased to the extent of $508.35. As thus increased, the decree and judgment are affirmed.

---

Motion of respondent for attorney's fee allowed July 7, 1942

### On Allowance of Attorney's Fee
### (127 P. (2d) 346)

ROSSMAN, J. Based upon the provisions of § 101-134, O. C. L. A., the plaintiffs move for an order to include in the judgment the sum of $1,000 as an attorney fee for the services of their attorney in this court. The judgment of the circuit court included $1,500 for the services of the plaintiffs' attorney in the circuit court. The appellant, in resisting the motion, says:

"The provision of our Code giving to the successful plaintiff in an action against an insurance company an attorney fee is penal in its nature, and is designed to punish an insurance company for unjustifiably defending an action. Counsel for the appellant does not believe that this court will feel for an instant that it did not have a just and well-founded reason for securing a judicial determination of its liability."

The appellant then directs attention to the fact that the circuit court allowed the aforementioned sum of $1,500 and says that the award "was generous in the extreme."

We share in the view that the appellant could properly believe that it was entitled to a determination

by this court of its liability. We are satisfied that it was prompted by no improper motives. But we do not believe that the aforementioned statute is penal in nature. If it must be defined or classified, we would term it compensatory. See *Spicer v. Benefit Association of Railway Employees*, 142 Or. 574, 17 P. (2d) 1107, 21 P. (2d) 187, 90 A. L. R. 517; *Title & Trust Co. v. United States Fidelity & Guaranty Co.*, 138 Or. 467, 1 P. (2d) 1100, 7 P. (2d) 805. We have no reason for thinking that the circuit court's award of $1,500 was unreasonable in amount. The plaintiffs' pleadings were repeatedly attacked in the circuit court. Marshaling the evidence was no small task.

■ Considering the large sum involved in this appeal and the nature of the issues presented by the appellant, it is our belief that an award of $1,000 attorney fee for the services performed in this court is reasonable. The motion will, therefore, be sustained.