Argued November 6; defendants suspended December 12, 1945

# In re REILLY
# In re KERRIGAN

(164 P. (2d) 410)

Before BELT, Chief Justice, and KELLY, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*Robert A. Bennett,* of Portland, for Oregon State Bar.

*Leo J. Hanley,* of Portland (Cookingham & Hanley, of Portland, on the brief), for defendant Reilly.

*Glenn Y. Wells,* of Portland, for defendant Kerrigan.

KELLY, J.

Two separate cases are considered here, one, being a proceeding first heard before a trial committee of the Oregon State Bar and later reviewed by its Board of Governors wherein Ronald L. Reilly, an attorney at law, is charged with unprofessional conduct; the other, is a similar proceeding wherein Tom M. Kerrigan is likewise so charged.

Because these two proceedings were heard together before the trial committee and also before the Board of Governors, the testimony presented comprises only one transcript and upon the hearing before this court the proceedings were heard together, and for the further reason that the charges in the two proceedings are alike, we will dispose of both of them in one opinion.

On September 15, 1942, complaints by the Oregon State Bar were filed with its secretary charging the attorneys named with unprofessional conduct.

■ During the oral argument in this court, as well as in their briefs filed herein, defendants have presented the motions filed on December 16, 1944, asking that the transcript of proceedings before the Board of Governors of the Oregon State Bar, dated September 26, 1944, be stricken from the records and files in this cause. By their terms, these motions are based upon the records and files in this cause and upon the authority of Section 47-219, O. C. L. A., and upon sections 35 and 38 of the Rules of Procedure relative to disbarment, discipline and reinstatement of the members of the

Oregon State Bar, and upon the respective affidavits of Leo J. Hanley and Glenn Y. Wells for Mr. Reilly and Mr. Kerrigan respectively. These affidavits state that prior to said hearing before the Board of Governors, no application of any kind for the presentation of additional evidence for a hearing *de novo* before the Board of Governors supported by an affidavit stating the substance of any new evidence which any applicant desired to present before said board, and the reasons why the evidence was not presented to the trial committee was served upon defendants or either of them.

Section 47-219, Vol. 4, O. C. L. A., is as follows:

"Record of Hearings; Rules of Procedure. A record of all hearings shall be made and preserved by the board or committee. The board of governors, subject to the provisions of this act, may, by rule, provide the mode of procedure in all cases of complaints against members."

Section 35 of the Rules of Procedure is as follows:

"Section 35. Opposition to Report. At any time within 10 days after the mailing of the notice of report, either complainant or accused shall have the right to file with the secretary a typewritten statement either in support of or in opposition to the recommendations of the trial committee. Such statement may include an application for presentation of additional evidence or for a hearing *de novo* before the board, but the application must be supported by an affidavit stating the substance of any new evidence which the applicant desires to present and the reasons why the evidence was not presented to the trial committee, and if a hearing *de novo* is applied for, the grounds therefor."

Section 38 of the Rules of Procedure is as follows:

"Section 38. Review by Board. Each proceeding in which a hearing has been had before a trial

committee shall be reviewed by the board upon (1) the record made and transmitted to the secretary, (2) the statements, if any, in support of or in opposition to the recommendations of the trial committee, and (3) such additional evidence as may be heard by the board. * * *.''

There is nothing before us indicating that the testimony adduced before the Board of Governors was taken or heard at the instance of the complainant. On the contrary, the supplemental testimony was taken at the instance of the Board of Governors, acting as a court of inquiry, and, having for its purpose a full presentation of the facts involved. In this proceeding the Oregon State Bar must be considered as one entity represented by the attorney appearing for it and the Board of Governors as a distinct entity performing judicial functions.

There is nothing in Section 35 of the Rules of Procedure, which places any restriction upon the Board of Governors with reference to eliciting testimony which serves to supplement the record made before the trial committee.

In the instant case the defendants were personally present and were represented by counsel during the proceedings before the Board of Governors. There is nothing to indicate that their rights to a fair trial were in any way invaded or impaired.

The motion to strike the transcript of testimony then and there taken is denied.

Seven separately stated charges are set forth in such complaint. Each of these charges arises out of the accused attorneys' relation to and dealings with the heirs of the late Plympton J. Kelly, who died on or about October 18, 1933, in the State of Oregon, leaving

an estate consisting of real and personal property of the appraised value, according to the original inventory and appraisement, of $90,055.87. After a hearing the trial committee of the Oregon State Bar recommended that the charges be dismissed. Upon a review by the Board of Governors of the Oregon State Bar, supplemental testimony having been heard, the Board of Governors recommended that Mr. Reilly be disbarred and Mr. Kerrigan suspended for three years.

On the 11th day of October, 1933, Plympton J. Kelly executed a purported will wherein he attempted to devise and bequeath his property as follows:

To his brother, L. J. Kelly, a tract of land consisting of 4.92 acres more or less in section 13 township 1 south range 1 east of the Willamette Meridian in Multnomah County, Oregon, fronting on Steele Avenue, together with the rent therefor due from A. B. Lambert; a note and mortgage executed to Emma D. Bach; three notes and mortgages executed by A. M. Sauter and Lelia H. Sauter; a note and mortgage executed by H. V. Thompson and Anna M. Thompson, and Lots 9 and 10 in Block 3, Rosalind Addition to the City of Portland, Oregon.

To his brother, L. B. Kelly, all of his property in Wasco County, Oregon, consisting of 550 acres more or less.

To his deceased wife's nephew, John Elmer McClure, all of his property in Umatilla County, Oregon, consisting of 314 acres more or less.

To Jessie G. Northrop, his nurse, by specific description the tract of 6.04 acres more or less fronting on East 28th Street, between Raymond and Mitchell Avenue, Portland, Oregon, being his home place, and

the tract of 1.83 acres more or less being the parcel 200 x 400 feet fronting on Steele Avenue.

And generally, to Jessie G. Northrop, all the rest, residue and remainder of his estate, real, personal or mixed wheresoever situate.

On the 26th day of October, 1933, said purported will was admitted to probate and Jessie G. Northrop and O. C. Roehr were appointed executrix and executor respectively thereof.

On or about the 10th day of November, 1933, L. J. Kelly, since deceased, representing the natural heirs of Plympton J. Kelly, entered into a contract with the accused attorneys, who will be termed the defendants, and J. L. Hammersly, now deceased, evidenced by a written agreement as follows:

### "AGREEMENT.

"This agreement made and entered into this 10 day of November 1933, by and between L. J. Kelly, representing the natural heirs of the estate of P. J. Kelly, deceased, first party and T. M. Kerrigan, Joe Hammersly and Ronald L. Reilly, attorneys, second parties,

Witnesseth:

That said first party is desireous of filing an action in the Circuit Court of Multnomah County, State of Oregon, to set aside the will of P. J. Kelly, deceased, and whereas it is necessary that attorneys be employed to represent the said first party in said litigation.

Now Therefore, it is Agreed by and between the parties hereto that the said first party employ second parties as attorneys to represent them in the litigation and agrees to pay for their services in the following manner towit:

The said first parties shall advance and pay all necessary costs and disbursements incident to the

trial of the above entitled cause including filing fees, shariff's fees, depositions, costs of proceedings, witnesses to appear at said trial, transcripts of evidence and briefs and such other incident expences as may be necessary to a proper presentation to their cause in court and in the event that said will is broken, parties of the first part agree to pay second parties for their services, 50% of any money, property, bonds, stocks or other assets which the said P. J. Kelly left to one, Jessie Northrop, under the terms of said will or its equivilint in cash, said amount of cash equivilent to be agreed upon by the parties hereto at the time of distribution of said estate and that such sum or property shall be the entire fee of second parties.

In the event that said litigation is not successful and that the will of said P. J. Kelly is not set aside, then upon the payment of costs and disbursements as above set forth, first parties shall be released from all obligation to pay second parties any attorney fees whatsoever.

It is further understood between the parties hereto that neither parties will settle or compromise said claim or any other litigation growing out of the same without the full knowledge and consent of the other parties.

In witness whereof we hereunto set our hands and seals upon this —— day of November 1933.

L. J. Kelly
First Party

T. M. Kerrigan
Ronald L. Reilly
J. L. Hammersly
Second Parties.

Read and approved
     L. B. Kelly

Read and approved
     Lloyd T. Woodside.''

On November 20, 1933, a petition to set aside the will in suit was filed in the Probate Department of the Circuit Court of Multnomah County, Oregon, wherein Gertrude Hunter, Lloyd Woodside, L. J. Kelly and Elmer McClure were petitioners and contestants, and were attorneys for said petitioners and contestants.

On April 27, 1934, a decree was rendered by said circuit court in and for Multnomah County in said proceeding setting aside and declaring for naught the purported will in suit, and said Hammersly was appointed administrator of the estate in suit.

On June 4, 1934, a petition was filed in said Probate Department of the Circuit Court in and for Multnomah County by the heirs of Plympton J. Kelly, asking that they be allowed $5,900.00, as attorney's fee, for conducting the suit contesting said purported will. On the 31st day of May, 1934, this petition was verified by L. J. Kelly, now deceased, before said defendant Tom M. Kerrigan as a notary public.

The stenographic notes of the official reporter of the Probate Department of said Circuit Court, as shown by the testimony of the reporter, disclose that on the 19th day of June, 1934, at 9:30 A. M. a hearing was held before Judge Tazwell, judge of said court, and upon said petition for allowance of contestants attorney's fee. At this hearing defendants were present representing the administrator.

After a statement to the court by Mr. Reilly as to the subject matter of the petition, the only questions submitted were as to the reasonableness of the attorney's fee and whether it should be allowed.

The late Judge John P. Winter and Judge F. C. Howell, who were then in the private practice and not upon the bench, were called and sworn and each of them

testified to the effect that $5,900.00 would be a reasonable fee to be allowed for contesting a will where the value of the property, which otherwise would have gone to the legatees, who were not natural heirs of the deceased, was $59,000.00.

The following is an excerpt from the cross-examination of Judge Winter:

"Q * * * would you say that the attorneys having an agreement with the heirs on a contingent basis of fifty per cent of such sum as they recovered would in any way affect your opinion as to what they should be allowed? In other words would this be additional to the fifty per cent contingent basis?

A No this would be the fee.

Q This would be the fee

A Yes.

Q Well then, if it were not denied that they took this case on a fifty per cent. contingent basis would you be inclined to allow an additional fee of $5900?

A No, no, I figure this to be the fee."

We also quote from the cross-examination of Judge Howell:

"Q If you were informed that the attorneys for the contestant had the case on the basis of fifty per cent of what might be saved, or what might be recovered from this person, not an heir, would you still feel that $5900 should be allowed?

A If that is a fact, there should not be an additional allowance."

Upon the above showing the judge of the Probate Department of the Circuit Court allowed $2,000.00 attorney's fee for contesting the will in suit.

An appeal from the decree invalidating the purported will was instituted and prosecuted. On June 11, 1935, the decree of the trial court was affirmed by this court and on July 16, 1935, a motion for rehearing was denied.

On July 30, 1935, a supplemental inventory and appraisement was filed in the department of probate of the circuit court in the matter of the estate in suit, and on August 13, 1935, a corrected supplemental inventory and appraisement was filed therein.

On August 16, 1935, the final account of Joseph L. Hammersly, as administrator of the estate in suit was filed.

Sometime in June, 1935, the heirs indicated a desire to receive the real property in the final distribution of the assets and defendants and Hammersly expressed their assent thereto.

On September 18, 1935, a typewritten slip was handed to each of the heirs showing what such heirs would receive, and the valuation ascribed to each item thereof.

The following is a copy of such slips:

"Jack Kelly

| | |
|---|---:|
| Home place | $6750.00 |
| Spring place | 2000.00 |
| Story Note | 176.26 |
| Furniture & Tools | 578.00 |
| Govt. Bonds, | 1255.00 |
| Cash | 1146.80 |
| Total | 11906.06 |

Lew Kelly

| | |
|---|---:|
| Maupin Ranch | $8250.00 |
| Rosenberg Note | 82.48 |
| Govt. Bonds | 1255.00 |
| Cash | 2318.58 |
| Total | 11906.06 |

Woodside
| | |
|---|---|
| Lots | $900.00 |
| Sater Note | 500.85 |
| McClure Mtg. | 2000.00 |
| Bonds. | 627.50 |
| Cash | 1919.68 |

Mrs. Hunter
| | | |
|---|---|---|
| Lambert Tract | $2300.00 | |
| Bock Mortgage | 2500.00 | |
| Govt. Bonds | 627.50 | |
| Cash | 527.53 | Total $5954.53.'' |

Jack Kelly is otherwise designated as L. J. Kelly. He died on July 15, 1940. Lew Kelly is known to this record as L. B. Kelly. He died on the     day of May, 1938. The person designated on one of the four typewritten slips as Woodside is the son of Stella Woodside, deceased, daughter of Zora Kelly Truman, deceased, who was the daughter of L. B. Kelly. The person designated on one of said slips as Mrs. Hunter is a daughter of said Zora Kelly Truman.

On September 18, 1935, the distribution was made of the remaining assets to the heirs and to Mr. McClure, who was not an heir of Plympton J. Kelly, but who was a beneficiary under the purported will and by agreement received the legacy prescribed in said will.

The distribution to the heirs was made conformably to the allocation of assets reflected by said typewritten slips.

Mr. Kerrigan testified that he obtained the information which appears upon these slips from Mr. Woodside, and Mr. Herz, an accountant employed by Mr.

Hammersly, and "typed it off and handed it to the heirs there as to what their proportionate share would be."

Defendants and Mr. Hammersly received assets substantially in accordance with a typewritten list known to this record as Bar Exhibit 19, of which the following is a copy, to-wit:

| | Principal |
|---|---|
| "1—$1000 Bond, 5½%<br>    due 9/1/39, Int. 3/1 & 9/1 | $ 800.00 |
| 8—$1000 Seaside, 6%<br>    Due 9/1/44, Int. 3/1 & 9/1 | 5429.33 |
| 4—$1000 Kelso, 5½%<br>    Due 9/1/37, Int. 3/1 & 9/1 | 3800.00 |
| 1—$1000 Kelso, 5½%<br>    Due        Int. 3/1 & 9/1 | 950.00 |
| 4—$500 St. Helens, 6%<br>    Due 2/1/40, Int. 2/1 & 8/1 | 1500.00 |
| 2—$500 Eugene, 5½%<br>    Due 2/15/37, Int. 2/15 & 8/15 | 1020.00 |
| 1—$1000 Klamath County, 5½%<br>    Due 2/1/39, Int. 4/1 & 10/1 | 1052.00 |
| 1—$1000 Klamath County, 5%<br>    Due 7/1/37, Int. 1/1 & 7/1 | 1030.00 |
| 4—$1000 Hawley, 6%<br>    Due 7/1/46, Int. 1/1 & 7/1<br><br>1—$500 Hawley, 6%<br>    Due 7/1/33, Int. 1/1 & 7/1 | ) ) ) ) ) 1651.95 |
| 1—$1000 Master Printers, 6%<br>    Due 11/1/41<br><br>4—$100 Master Printers, 6%<br>    Due 11/1/41 | ) ) ) 261.36 ) ) |

| | |
|---|---|
| 3—$1000 Associated Gas, 5%<br>Due 10/1/38, Int. 4/1 & 10/1 | 754.48 |

3—$1000 Columbia Ass'n. 7% )
 Due 10/1/38, Int. 4/1 & 10/1 )
           )
3—$500 Columbia Ass'n. 7%  )
 Due 10/1/38, Int. 4/1 & 10/1 )
           )  1168.00
1—$112.50 Columbia Ass'n.  )
 Due 4/1/33        )
           )
1—$112.50 Columbia Ass'n.  )
 Due 10/1/33       )

| | |
|---|---|
| 5—$1000 Wn.-Calif. Co., 6%<br>Due 9/1/44, Int. 3/1 & 9/1 | 498.00 |
| 1—Deposit receipt of Anglo<br>Calif. Bank | no market value |
| $7500 Astoria | 1650.00 |
| 5—$1000 Medical Arts Co.<br>Registered Certificate | 2748.00 |
|          Total | $24313.12" |

Mr. Reilly testified that the respective amounts appearing on the foregoing exhibit opposite each item respectively were the sums reported to defendants by Mr. Hammersly as having been realized by him from the sale of the securities there listed.

Mr. James F. Miller, who was engaged in the investment business and connected with Blyth & Company, after testifying that he had been engaged as a dealer in bonds and stocks as a trader and as municipal manager and had been so engaged for practically twenty years, further testified to an appraisal of each

item of the securities listed in said Bar Exhibit 19, as of September 18, 1945, the total amount of such appraised valuation being $30,030.00. This sum exceeds the amount of the 1933 appraisal ($16,588.13) by $13,441.87.

Mr. Reilly testified that Mr. Hammersly, acting for himself and the defendants, disposed of the stocks and bonds and ultimately the three attorneys disposed of other securities realizing an advance of approximately $3,000 over the originally appraised valuation.

Mr. Kerrigan was absent from the State of Oregon, leaving about the first of July, 1935, and returning the first or second week of September, 1935. The distribution was made in September, 1935, and it is undisputed that Mr. Kerrigan received one-third of the total amount realized from the litigation under consideration.

Mr. Reilly urges that his duty to his clients, the Kelly heirs, was fully performed when he made a suggestion to the heirs that the only fair way to distribute the assets in suit was to have a reappraisal made. When he was asked by his clients what such appraisal would cost, he suggested that the former appraisal cost in the aggregate of $270.00, the heirs decided not to have such reappraisal made. It nowhere appears that either of the three attorneys for the heirs of this estate informed them or any of them that an accurate evaluation of the stocks and bonds could be had from a dealer in such securities, if upon a current date merely for the asking, and, if for a remote date, then approximately $60.00 would be sufficient to secure such appraisal.

■ We cannot agree that there was no duty upon the part of the three attorneys for the Kelly heirs to ascertain and advise them of the market value of the se-

curities which were to be distributed. This advice should have been afforded sufficiently in advance of the distribution to enable due consideration thereof to be given by all parties concerned.

Instead of advising their clients of the increase over the 1933 appraisal in value of the stocks and bonds, which defendants accepted as their fee, they permitted the distribution of the assets to be made upon the valuation placed therein in the 1933 appraisal.

As above stated, according to Mr. Reilly's testimony, defendants profited thereby in the sum of approximately $3000. A careful consideration of the testimony warrants the conclusion that the aggregate profit to these attorneys, Hammersly and defendants, was greatly in excess of the sum mentioned by Reilly.

It must be borne in mind that defendants were acting together with Mr. Hammersly in administering this estate, each receiving not only one-third of the proceeds derived from fifty per cent of the Northrop grant, but also one-third of the fees, perquisites and emoluments received by reason of their administration of the estate.

The statute stating the rule applicable to those who engage in such service by its context refers to an executor or administrator; but, under the record before us, these three attorneys, defendants and Hammersly, were acting in concert and sharing the proceeds of their services. Each of them should have complied with the terms of this statute which declares that the personal representative shall not make profit by the increase in the value of the property of the estate. Section 19-1008, Vol. 2, O. C. L. A., p. 620.

Clearly, the statute enjoins the duty of ascertaining or, at least, of making every reasonable effort to ascertain, the value of any property of the estate which the personal representative proposes to receive from the estate, and strictly accounting for any increase in the value thereof upon taking the same.

■ It has been urged that we are not warranted in concluding as we did in the case of *Hagey v. Mass. Bonding & Ins. Co.,* 169 Or. 132, 155, 126 P. (2d) 836, that the heirs had no knowledge that anything was being asked by Mr. Reilly and Mr. Kerrigan in the final accounting for administration services, and that it was understood that the attorneys would not make any additional charge over and above fifty per cent of the amount represented by the Northrop grant. Bar Exhibit 26A, being a letter dated January 3, 1938, signed by Mr. Reilly, expresses the same view as that which we held in the Hagey case. Mr. John Lichty, an attorney of this court, testified to conversations had about January 29, 1938, with both defendants in which Mr. Lichty said to them that he thought they were entitled under their contract to a fee for probating the estate; but they assured him it was never their intention to charge that, and they did not charge it, and an accounting would show that including the $2,000 which they had received, they had not received more than their contract percentage from the heirs. We are constrained to give effect to the defendants' construction of the agreement as stated in Bar Exhibit 26A and in defendants' conversations with Mr. Lichty.

It is true that Mr. Reilly, although admitting that he signed it, disclaims authorship of the letter known to this record as Bar Exhibit 26A. It is upon his office stationery and the typed abbreviations thereupon indicate that it was dictated by him.

It is also true that in his testimony Mr. Reilly made an explanation concerning the conversation he and Mr. Kerrigan had with Mr. Lichty by saying that Mr. Lichty was not in Mr. Reilly's office at the time referred to by Mr. Lichty and Mr. Kerrigan testified that he thought Mr. Lichty was mistaken.

We quote Mr. Reilly's explanation as follows:

"A Well, all I can explain as to that is that to my knowledge John Lichty was never in my office upon this question of this letter until such time as we began to prepare the case for trial. I would like to state that after receiving this letter MacCormac Snow suggested, or rather it was suggested between us, that possibly this matter could be determined by an arbitration, and the question of arbitration was discussed back and forth with letters to John Lichty, and letters to the home office, and that continued on for two or three months, until finally the home office refused to make certain waivers that MacCormac Snow thought that they might make, and it was after that that I saw John Lichty to discuss anything in connection with this case. Joe Hammersley and Tom Kerrigan and I went to Lichty's office together to discuss it, the three of us, we discussed generally the letter. Mr. Lichty said the only things he was interested in, the only thing he could see any difficulty with was the question of this $2,000.00 fee which we had received as the fee for Kelly breaking the will. And we showed him where we had taken care of that matter, and accounted for that matter to his satisfaction, and he says, 'Well, you don't have to worry about anything else.' We had several conversations in the preparation of the case, and I am confident that John Lichty knew that it was on record. We had the final account, we had the papers there that we had received this $2,000.00 as administrator's fee and attorneys' fee, and that our checks were cancelled and in the record.''

We also quote Mr. Kerrigan's answer concerning Mr. Lichty's statement:

"A. Well, I would say in regard to Mr. Lichty's testimony this morning that I think he was mistaken that I ever talked the matter over with him at all until after Mr. Reilly and Mr. Lichty and Mr. Snow —I don't know whether Mr. Hammersley was in on that before the insurance company and Snow couldn't seem to get together with Mr. Lichty on— what would you call it, an adjustment?

Q Yes.

The Witness: And Mr. Snow said he was going to institute a suit, and Mr. Lichty then called myself and Reilly, or called me anyway, and I guess he called Reilly and Hammersley, because we all met in Lichty's office, and that was a long time after that letter that was written by Reilly which I never had no information or knowledge had ever been written until the trial of the Hagey case. * * *"

The positive testimony of Mr. Lichty, corroborated by the statements in said Bar Exhibit 26A, convinces us that both Mr. Reilly and Mr. Kerrigan and the late Mr. Hammersly definitely understood that they were to receive no other compensation for their services— including the service as the administrator and the service as attorneys for the administrator—than fifty per cent of the value of the Northrup grant.

Three charges have been proven:

1. Deception practiced upon the judge of the Probate Department of the Circuit Court in and for Multnomah County, Oregon, in presenting a petition for the allowance of $5,900.00 as attorney's fee for contesting the purported will of Plympton J. Kelly, and in thereby securing an allowance of an attorney's fee therefor in the sum of $2,000.00, said deception consisting of

withholding from said judge at said time the fact that the only compensation to which said attorneys were entitled was contingent upon being finally successful in contesting said will, and said contest was then pending and not finally determined.

2. Withholding information from the heirs of Plympton J. Kelly, deceased, that the market price of the stocks and bonds belonging to his estate had materially increased since the inventory and appraisement thereof had been made and prior to the filing of the administrator's final account in said Probate Department of the Circuit Court; and in receiving and accepting, when the assets remaining in said estate at the time of the approval of the final account were distributed, stocks and bonds at the value ascribed thereto by the inventory and appraisement when in fact the market value thereof was greatly in excess of said appraised value which fact was then and there known to the attorneys and not known to the heirs of said Plympton J. Kelly.

3. In securing the allowance of $4,000.00 as administrator and attorney's fee for administering the estate of Plympton J. Kelly, deceased, and in receiving and accepting two-thirds of said $4,000.00 when, by reason of their agreement with the heirs of said estate, defendants were not entitled to any other or further attorney's fee than that which was provided in their original contract wherein only a contingent fee was agreed upon.

To thus determine the issues in this case is a disagreeable and unpleasant task. We would far prefer to regard the record as one which would permit us to follow the findings of the trial committee, but this we cannot do.

The lapse of time since the misconduct of the defendants occurred and the time during which they have been under the embarrassment of the pendency of the charges against them and the radical difference between the conclusions of the trial committee and those of the Board of Governors are circumstances we have in mind in failing fully to adopt the recommendation of the Board of Governors.

We think that both Reilly and Kerrigan are equally at fault and, hence, it is the judgment of this court that each of them be, and he is hereby, suspended from the practice of law for a term of two years beginning on this 12th day of December, 1945.

It is also ordered that a duly certified copy of this judgment of suspension be forthwith sent to the secretary of the Oregon State Bar.